# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**DAVID HARVEY**, *et al.*,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　**Plaintiffs,**　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　**v.**　　　　　　　　　　　　　　　)　　**Civil Action No. 02-2476 (RCL)**
　　　　　　　　　　　　　　　　　　　)
**MOHAMMED**, *et al.*,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　**Defendants.**　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)

---

## MEMORANDUM OPINION

Plaintiff David Harvey, as Personal Representative of the Estate of Curtis Suggs, brings this case against defendants Leon Mohammed, Yvonne Mohammed,[1] Symbral Foundation for Community Services, Inc., Donald C. Egbuonu, M.D., and the District of Columbia under 42 U.S.C. § 1983, D.C. Code § 7-1301.02, et seq., federal and District of Columbia statutes regulating community residential facilities, and the common law of the District of Columbia, seeking compensatory and punitive damages against Mr. Suggs's former caretakers. Before the Court are defendants Leon Mohammed, Yvonne Mohammed, and Symbral Foundation for Community Services, Inc.'s ("Symbral defendants") Motion [120] for Partial Summary Judgment; defendant District of Columbia's Motion [123] for Summary Judgment, or in the alternative, for Reconsideration; and plaintiff' Motion [128] for Partial Summary Judgment. Upon consideration of the Symbral defendants' Motion [120], plaintiff's opposition [141], the Symbral defendants' reply [149], the applicable law, and the entire record in this case, the Symbral defendants' Motion is granted in part and denied in part. Upon consideration of the

---

[1] On March 15, 2011, defendants Leon Mohammed and Symbral Foundation for Community Services, Inc. filed notice of the death of defendant Yvonne Mohammed. *See* ECF No. 110. Counsel for defendants should take prompt action to get letters of administration and substitute Ms. Mohammed's estate as a party defendant in this action.

District of Columbia's Motion [123], plaintiff's opposition [136, 138], the District of Columbia's reply [150], the applicable law, and the entire record in this case, the District of Columbia's Motion is granted in part and denied in part.  Upon consideration of plaintiff's Motion [128], defendants' oppositions [148, 150], plaintiff's reply [158, 162], the applicable law, and the entire record in this case, the plaintiff's Motion is granted in part and denied in part.

## I.    BACKGROUND

Curtis Suggs was born on May 12, 1932 in South Carolina and was diagnosed with cognitive and adaptive profound mental retardation, athetoid cerebral palsy, seizure disorder, scoliosis venous stasis, presbyopnia, bilateral hearing loss, urinary incontinence, and spinal cord stenosis.  Curtis lived with his mother and sister, Carrie Weaver, in the District of Columbia until 1967 when his sister applied to have him committed to the District's custody because his family could no longer care for him.  The United States District Court ordered Mr. Suggs to be committed to the District's custody, finding him to be "feeble-minded," "incapable of managing his affairs," and a "fit subject for commitment to and treatment at the District Training School." Pl.'s Mot. for Summ. J., Ex. 2.

When Mr. Suggs was initially committed to the custody of the District, he resided at Forest Haven, an institution in Maryland.  After the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978 was passed, the Mental Retardation Developmental Disabilities Administration ("MRDDA") became the designated District agency responsible for the care and habilitation of persons legally committed to the District's custody.  In October 1984, after the District had been ordered to place Forest Haven residents in community residential facilities, the District determined that Mr. Suggs needed an Intermediate Level of Care for Mentally Retarded Individuals ("ICF/MR").  Mr. Suggs was placed at a group home on Blair Road in Washington,

D.C. operated by defendant Symbral Foundation for Community Services, Inc. ("Symbral"),
where he resided until his death on June 30, 2000.  Mr. Suggs was one of four residents at the
Blair Road home.  Defendants Yvonne Mohammed and Leon Mohammed were co-founders of
Symbral.  At the time of the events in this case, Yvonne Mohammed also served as Symbral's
CEO, while Leon Mohammed served as Symbral's CFO.  Defendant Donald C. Egbuonu, M.D.
was licensed to practice medicine in the District of Columbia and rendered medical care to Mr.
Suggs at the Symbral Blair Road home.

Symbral is an independent contractor that ran an intermediate care facility under annual
contracts with the District of Columbia, by which Symbral agreed to provide a living facility for
Mr. Suggs that satisfied the requirements for licensure in the District and provide Mr. Suggs with
health-related care and services.  Symbral employed two direct care staff on duty who were
responsible for meeting the residents' needs for feeding, bathing, hygiene, dressing, movement
exercises, and other activities.  The house was under the direction of a house manager and a
residential services coordinator.  Symbral also employed a registered nurse as the director of
nursing, a licensed practical nurse, and a qualified mental retardation professional ("QMRP"),
who had overall responsibility for the coordination of services and care to residents.  Under its
agreement with the District, Symbral provided supervision for and control over the day-to-day
operations of the employees that cared for Mr. Suggs.

Although MRDDA contractually delegated the day-to-day responsibility for the care and
habilitation to the ICF/MR provider in the residential system—Symbral, in this case—MRDDA
remained the agency legally responsible for Mr. Suggs.  As such, Mr. Suggs's MRDDA case
manager was responsible for overseeing all of the components of Mr. Suggs's individual
habilitation plan ("IHP"), a written plan which detailed his strengths, weaknesses, and goals

based on assessments by therapists, clinicians, and other health care professionals.  The IHP is developed by the Inter-Disciplinary Team ("IDT") comprised of clinicians such as a nurse, a speech and language pathologist, physical and occupational therapists, the MRDDA case manager, and the Symbral QMRP.  Mr. Suggs's MRDDA case manager was required to coordinate and monitor the IHP and was responsible for approving the IHP document.  Additionally, the case manager was responsible for following up on medical recommendations made in the IHP to ensure that Mr. Suggs received those services.  If Mr. Suggs was not receiving services in accordance with his IHP, the case manager was expected to inform Symbral and the case manager's supervisor.  Mr. Suggs's MRDDA case manager was required to visit him at least four times per year to carry out these responsibilities.  Sarah Jenkins was Mr. Suggs's assigned MRDDA case manager until 1998, when she was replaced by Shireen Hodge.

While Mr. Suggs's MRDDA case manager oversaw all of the components of his IHP, the Symbral QMRP was responsible for implementing Mr. Suggs's IHP.  The QMRP was required to attend the IDT meeting and write the IHP document for approval by Mr. Suggs's MRDDA case manager.  The QMRP was also required to schedule medical appointments as recommended in the IHP.

In addition to the IDT who monitored Mr. Suggs's condition and care, a court hearing was held each year in the District of Columbia Superior Court to review Mr. Suggs's condition and continued residential placement.  Mr. Suggs was also enrolled in a daycare program operated by United Cerebral Palsy (UCP), where he spent each weekday for observation and monitoring of his condition.

In the second half of the 1990s, Mr. Suggs experienced a precipitous loss of health, including a loss of motor function, increased weakness in his extremities, dehydration, decubitus

ulcers, and incontinence.  Mr. Suggs ultimately died on June 30, 2000 from paralysis of the diaphragm.

## II.        STANDARD OF REVIEW

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).  In order to defeat summary judgment, a factual dispute must be capable of affecting the substantive outcome of the case and be supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242–43 (D.C. Cir. 1987).  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[, and t]he moving party is entitled to judgment as a matter of law."  *Celotext Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party asserting that a fact cannot be genuinely disputed must support the assertion by showing that "an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  This subdivision of Rule 56 recognizes that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."  *Id.*, Note to 2009 Amendments.  If facts are unavailable to the nonmovant, the nonmovant must show "by affidavit

or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d).

### B. Reconsideration

Rule 54(b) of the Federal Rules of Civil Procedure allows this Court to modify interlocutory orders as justice requires. Fed. R. Civ. P. 54(b); *see also Hoffman v. District of Columbia*, 681 F. Supp. 2d 86, 90 (D.D.C. 2010). "[A]sking 'what justice requires' amounts to determining, within the court's discretion, whether reconsideration is necessary under the relevant circumstances." *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005). Relevant circumstances that may warrant reconsideration include "whether a court has 'patently misunderstood a party, has made a decision outside the adversarial issues presented to the court by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the court.'" *Ficken v. Golden*, 696 F. Supp. 2d 21, 35 (D.D.C. 2010) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)).

### III.   ANALYSIS

### A.   Defendant District of Columbia's Motion for Reconsideration

Defendant District of Columbia has failed to demonstrate that justice requires modification of Judge Sullivan's December 8, 2010 Order denying the District's Motion [97] to dismiss for lack of subject matter jurisdiction. The District renews its arguments that the plaintiff's claims in this lawsuit are precluded by the settlement agreement in *Evans v. Gray*, No. 76-cv-293 (D.D.C.) (Huvelle, J.), but offers no evidence demonstrating that the Court "patently misunderstood a party, has made a decision outside the adversarial issues presented to the court by the parties, has made an error not of reasoning, but of apprehension, or [that] a controlling or

significant change in the law or facts [has occurred] since the submission of the issue to the court." *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004).  The Court will therefore deny the District's Motion for reconsideration and will proceed to address the parties' arguments in their motions for summary judgment.

### B.  Plaintiff's Negligence Claims

#### 1.  Count I: Negligence

Plaintiff brings a negligence claim against the District of Columbia, Symbral, the Mohammeds, and Dr. Egbuonu for failure to fulfill their duties to provide Mr. Suggs with adequate food, shelter, clothing, and medical care and to properly monitor, assess, treat, maintain, and protect him.  The Mohammeds, the District of Columbia, and the plaintiff all move for summary judgment on this count.

To establish negligence, the plaintiff must show: (1) the applicable standard of care, (2) a deviation from that standard by the defendants, and (3) a causal relationship between that deviation and Mr. Suggs's injury.  *See Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997).  "[I]f the subject in question is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson," expert testimony is usually required to prove the standard of care.  *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987).  This general rule is most commonly applied to professional malpractice cases such as this one.  *See, e.g.*, *Eibl v. Kogan*, 494 A.2d 640, 642–43 (D.C. 1985); *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984).

### a.  District of Columbia

The plaintiff and the District of Columbia move for summary judgment on the issue of whether the District of Columbia negligently supervised Symbral in its treatment of and care for

Mr. Suggs.  The plaintiff argues that District of Columbia case workers had the duty to monitor Symbral's care of Mr.  Suggs, and that the District failed to fulfill this duty.  The District maintains that any duty that it originally owed to Mr. Suggs was delegated to Symbral, and that it retained no duty to monitor Symbral's care of Mr. Suggs.  The District further asserts that the plaintiff actually seeks to hold the District vicariously liable for the alleged negligence of Symbral, but that Symbral was an independent contractor, and "an employer generally is not liable for injuries caused by an independent contractor over whom (or over whose work) the employer has reserved no control."  *District of Columbia v. Howell*, 607 A.2d 501, 504 (D.C. 1992).  However, the Court need not reach the question of whether the District can be held vicariously liable for Symbral's allegedly negligent acts because it is clear from the plaintiff's pleadings that the plaintiff seeks to hold the District of Columbia liable for its own alleged negligence.

The plaintiff establishes the standard of care applicable to the District's duty to monitor Symbral's care of Mr. Suggs with expert testimony from Mary Devasia, the District's 30(b)(6) representative.  The District had an obligation to monitor the care being provided to Mr. Suggs, and the MRDDA case manager had an obligation to make quarterly visits to Mr. Suggs and to ensure that all medical appointments and other appropriate care was provided to Mr. Suggs.  *See* Pl.'s Mot. for Summ. J. Ex. 6, at 23–24.

The record clearly establishes that the District failed to fulfill its duty to monitor Symbral's care of Mr. Suggs, and that this breach caused Mr. Suggs harm.  In 1994, the IHP for Mr. Suggs reported that Mr. Suggs was in good health and could feed himself, stand with support, and initiate and respond to communication from his peers.  Pl.'s Mot. for Summ. J., Ex. 42.  The 1995 and 1996 IHPs for Mr. Suggs reported that his condition had begun to

deteriorate—he lost strength in his upper extremities and became incontinent. *Id.* Exs. 43, 44. In September 1995, Mr. Suggs's day program physical therapist at UCP noted a decline in his upper body strength and recommended a neurology consultation to determine the cause of the decreased strength in his upper extremities. *Id.* Ex. 14. On March 5, 1996, Sarah Jenkins, Mr. Suggs's MRDDA case manager, met with Mr. Suggs's IDT at Symbral and noted the UCP physical therapist's recommendation for a neurology evaluation. *Id.* Ex. 33. However, Ms. Jenkins did not schedule the evaluation at this time, and although the IDT recognized Mr. Suggs's inability to feed himself due to his loss of motor function, Mr. Suggs's 1996 IHP neglected to include UCP's continued recommendation for a neurology consult to address this. *Id.* Exs. 6, 33.

On February 19, 1997, UCP coordinator Joan Whitney notified Symbral that in addition to never being scheduled, the neurology consult recommendation was missing from Mr. Suggs's 1996 IHP. *Id.* Ex. 16. Then on February 20, 1997, the Healthcare Financing surveyor Semret Tesfaye cited Symbral with a Deficiency Notice for failing to promptly schedule the neurology consult in 1995. *Id.* Ex. 17. The Deficiency Notice was issued to Yvonne Mohammed, as CEO of Symbral. On March 7, 1997, Ms. Mohammed signed a Plan of Correction and scheduled a neurology appointment for Mr. Suggs that same day. Ms. Mohammed agreed in the Plan of Correction that Symbral would "make all medical appointments within one month of the recommendation." *Id.* Ex. 17.

Mr. Suggs was taken to Georgetown Neurology for an examination by neurologist Kenneth Plotkin, M.D. *Id.* Ex. 18(a). Dr. Plotkin noted that Mr. Suggs had decreased muscle tone, decreased use of his upper extremities, and that he was unable to feed himself. Dr. Plotkin thought that cervical stenosis (compression of the cervical spine) could be the cause of Mr.

Suggs's decreased ability to use his upper extremities, and recommended that an MRI be taken of Mr. Suggs's cervical spine as soon as possible.  *Id.* Ex. 18(a).  However, this MRI was not immediately scheduled, and on April 1, 1997, Dr. Plotkin again examined Mr. Suggs and repeated his recommendation that this MRI be done.  *Id.* Ex. 18(a).  On April 18, 1997, Georgetown Hospital conducted the recommended MRI.  *Id.* Ex. 18(b).  The MRI studies showed severe spinal stenosis, or compression, at the C-2 level of Mr. Suggs's spine.  *Id.* Ex. 18(b).

Although Symbral was instructed to schedule a follow-up appointment with Dr. Plotkin on May 1, 1997, Mr. Suggs did not receive a follow-up evaluation from Dr. Plotkin until June 27, 1997, at which point Dr. Plotkin recommended a neurosurgery consultation to determine whether surgery would prevent further loss of function.  On September 23, 1997, Dr. Plotkin noted that Mr. Suggs had not yet had the neurosurgery consultation and again recommended it. *Id.* Ex. 18(a).  Despite Symbral's promise to schedule "all medical appointments within one month," and despite the MRDDA case manager's duty to ensure that these appointments were scheduled, Symbral did not schedule Mr. Suggs's neurosurgery appointment until November 11, 1997.

On November 11, 1997, Dr. Fraser Henderson, a Georgetown University neurosurgeon, examined Mr. Suggs and recommended that a laminectomy be performed "in the next few weeks" to relieve pressure on the spinal cord.  *Id.* Ex. 18(c).  On December 16, 1997, Dr. Plotkin wrote Symbral and "recommended proceeding with C-1-3 laminectomy as per Dr. Henderson to be scheduled ASAP."  *Id.* Ex. 18(a).  Instead of scheduling the surgery as recommended, Mr. Suggs's IDT waited four months, then decided at a meeting on March 19, 1998 to get a second opinion on whether the surgery should be performed.  *Id.* Ex. 18(d).

On May 22, 1998 and September 28, 1998, Symbral took Mr. Suggs to Howard University Hospital for two neurology visits, but Symbral never requested a second opinion regarding the recommended neck surgery.  Mr. Suggs's IDT waited until April 30, 1999 to obtain a second opinion, when Dr. Mills at Howard University Hospital stated that Mr. Suggs was a candidate for the recommended cervical laminectomy.  *Id.* Ex. 18(f).

Symbral waited until 1999 to contact Mr. Suggs's sister, Carrie Weaver, in South Carolina to discuss the proposed surgery, but failed to have a neurosurgeon speak with Ms. Weaver to explain the risks and benefits of the surgery.  Instead, Kendall LaRose, Symbral's residential coordinator who does not have medical training, called Ms. Weaver to discuss the recommended surgery.  *Id.* Ex. 13.  Mr. LaRose prepared a consent form for Ms. Weaver and mailed it to her on June 19, 1999, pursuant to which she declined to consent to the surgery on Mr. Suggs's behalf in August 1999.  However, under the District's medical consent policy from 1995 to 1999, the District officials could have signed the consent for surgery on Mr. Suggs's behalf, without consent or lack thereof from Ms. Weaver.  *Id.* Ex. 22.  In fact, the MRDDA administrator routinely signed consent forms for surgical procedures for Mr. Suggs in 1993, 1994, and 1997.  *Id.* Ex. 48.

Mr. Suggs was also evaluated by a neurosurgeon at Providence Hospital in December 1999, who concluded that at that time, surgery was unlikely to have any meaningful impact on Mr. Suggs's motor function or neurological status.  Symbral Defs.' Mot. for Summ. J. [120], Ex. 16.  Mr. Suggs never underwent the recommended laminectomy and on June 30, 2000, the compression of Mr. Suggs's cervical condition caused him to suffer paralysis of the diaphragm and die.  An autopsy confirmed the linkage between Mr. Suggs's medical condition and his death.  Pl.'s Mot. for Summ. J. [128], Exs. 23, 41.

The facts in the record demonstrate that Mr. Suggs's MRDDA case manager, Sarah Jenkins, did nothing between September 1995 and March 1997 to ensure that the recommendation for a neurology consultation in 1995 was ever carried out.  Yet, the MRDDA case manager was responsible for following up on medical recommendations made in the IHP to ensure that Mr. Suggs received those services.  If Mr. Suggs was not receiving services in accordance with his IHP, the case manager was expected to inform Symbral and the case manager's supervisor.  However, the evidence presented to the Court shows that the case manager did not do this in a timely manner, thereby constituting a breach of the duty that the District owed to Mr. Suggs to monitor Symbral and ensure the proper delivery of medical services to Mr. Suggs.  What's more, Mr. Suggs's medical records clearly show that the District's failure to monitor Symbral's care of Mr. Suggs resulted in the administration of substandard care by Symbral, leading to a decline in Mr. Suggs's medical condition—and ultimately, his death.

The MRDDA case manager's duty to monitor Symbral's care of Mr. Suggs included ensuring completion of his neurological evaluation.  *See id.* Ex. 6, at 74–76.  As the lengthy inaction by Mr. Suggs's MRDDA case manager makes clear, no reasonable juror could find that the District of Columbia's monitoring of Symbral's care for Mr. Suggs was anything but negligent.  Therefore, on the issue of the District's negligent monitoring of Symbral, the Court grants the plaintiff's motion for summary judgment and denies the District's motion for summary judgment.

### b.  Symbral

The plaintiff also moves for summary judgment on the issue of Symbral's negligent treatment of Mr. Suggs.

To establish the applicable standard of care flowing from Symbral to Mr. Suggs, the plaintiff submits expert testimony from Dr. Compton which states that a facility such as Symbral has the duty to comply with state and federal regulations as well as court orders related to treatment of and care for the mentally retarded population of the District of Columbia. *See* Pl.'s Mot. for Summ. J. Ex. 21, at 47–48. With regard to more specific duties, Dr. Compton testified that Symbral owed a duty of care to Mr. Suggs to: perform a risk assessment for pressure sores, *id.* at 48–49; document Mr. Suggs's skin integrity, *id.* at 155–56; follow the quarterly recommendations of a nutritionist for Mr. Suggs's diet, *id.* at 156; reposition Mr. Suggs for pressure offloading purposes to prevent ulcers, *id.* at 177; and ensure that Mr. Suggs had an appropriate and properly functioning wheelchair as per an occupational therapist or physical therapist's recommendation, *id.* at 179. Dr. Compton further testified that a failure to do these things would be a breach of the standard of care that Symbral owed to Mr. Suggs.

The evidence in the record shows that Symbral breached the duties that it owed to Mr. Suggs in a number of ways, and that these breaches caused harm to Mr. Suggs. In June 1996, D.C. surveyor Semret Tesfaye issued Symbral a deficiency report citing a number of violations. Symbral was cited because "the QMRP failed to integrate, coordinate and monitor the active treatment programs for 4 of 4 clients," including Mr. Suggs. Pl.'s Mot. for Summ. J., Ex. 49. Symbral was also cited for failing "to ensure that each client's wheelchair was maintained in good condition." *Id.* Ex. 12, at 28. Additionally, Symbral was cited because "[t]here was no evidence to indicate that the nutritionist had conducted a 90 day assessment for any of the four clients in 1996," *id.* Ex. 49, and because "[t]here was no evidence to indicate that the physical therapist had consistently conducted 90-day assessments." *Id.* Ex. 12, at 45–46.

13

Ms. Tesfaye cited Symbral again in February 1997 for failing to provide a neurology evaluation for Mr. Suggs's declining motor function.  *Id.* Ex. 12, at 61–64; *id.* Ex. 17.  This Statement of Deficiency, issued on February 20, 1997, stated that:

> Staff at the day program and the group home reported a gradual loss of activities of daily living skills (ADL) such as feeding, ability to ambulate and/or stand.  He was also observed being totally dependent on the staff for most of the activities that required motor skills such as eating, range of motion exercise and wiping of his table space after dinner.  According to the day program's report this client had shown a continued motor decline over the past 1-1/2 years.  On February 18, 1997, during client observation at the day program, the day program staff reported a concern to the surveyor about the lack of response from the group home regarding this client's condition.  They indicated that a neurological evaluation had been recommended by the day program, during the last two individual habilitation (IHP) meetings (in September 12, 1995 and in August 22, 1996). . . .  There was no documentation to show that the facility had provided a medical evaluation to find the underlying cause of this client's gradual deterioration as suggested by the day program, nor was there any explanation given by a physician supporting the assessment of the group home's physical therapist that the client's condition (weakness and loss of function) was not surprising given the client's chronological age and joint involvement.

*Id.* Ex. 17.

Ms. Tesfaye cited Symbral yet again on October 2, 1997 for violations of federal regulations, including a failure to monitor the active treatment program of all four residents at the Blair Road home, a failure to ensure that the nutritionist updated the nutritional status of the four residents, and a failure to follow the recommendation of the occupational therapist to ensure a proper functioning wheelchair for Mr. Suggs.  *See id.* Exs. 12, 17.

Meanwhile, Mr. Suggs had begun to experience decubitus ulcers on different parts of his body in August 1997.  Symbral Defs.' Mot. for Summ. J. [120], Ex. 4.  An ulcer on Mr. Suggs's left hip was a Stage III ulcer and required surgical debridement, which was performed in December 1999.  *Id.* Ex. 4.  Furthermore, a nursing admission assessment on December 18, 1999 noted discoloration of three toes on Mr. Suggs's right foot.  *Id.* Ex. 18.  An infectious disease

consultation on December 26, 1999 noted a "darkening of the third, fourth and fifth digits which may indicate some peripheral vascular disease with early gangrene." *Id.* Ex. 19.  The gangrene progressed during Mr. Suggs's hospitalization at this time, and a finding of significant peripheral vascular disease was made.   Given his poor circulation, contracted state, and inability to ambulate, doctors decided to perform an above-the-knee amputation of Mr. Suggs's right leg. After the surgery, Mr. Suggs was discharged on January 31, 2000. *Id.* Ex. 20.

On March 9, 2000, D.C. surveyor Marcella Torbit issued another deficiency report to Symbral for "failure of the facility's governing body to adequately govern and manage the facility to ensure [Mr. Suggs's] health and safety."  In particular, the deficiency report noted that Symbral "failed to ensure that [Mr. Suggs] received preventive services and prompt treatment for chronic health conditions and failed to ensure that [Mr. Suggs] received nursing services in accordance with his health needs."  Pl.'s Mot. for Summ. J. [128], Ex. 53.  The report also found that Symbral "failed to provide evidence of close monitoring or a nursing plan to facilitate the optimum care" of Mr. Suggs, particularly in regard to the care of his decubitus ulcers and his treatment in accordance with the hospital's discharge orders after his hospitalizations for decubiti therapy and the amputation of his leg. *Id.* Ex. 53.

This series of deficiency reports demonstrates that Symbral deviated from the standard of care that it owed to Mr. Suggs, and that Mr. Suggs's declining health condition was caused by this breach.  As no reasonable juror could find that a genuine issue of material fact remains, the Court will enter summary judgment in favor of the plaintiff on the issue of Symbral's negligence.

### c.  Mohammeds

The Mohammeds and the plaintiff move for summary judgment on the issue of the Mohammeds' negligent treatment of Mr. Suggs.  The Mohammeds concede the well-established

law that "[c]orporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Lawlor v. District of Columbia*, 758 A.2d 964, 974 (D.C. 2000) (internal quotations omitted). In other words, corporate officers "cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval." *Vuitch v. Furr*, 482 A.2d 811, 821 (D.C. 1984) (internal quotations omitted). However, "[a]n officer's liability is not based merely on the officer's position in the corporation; it is based on the officer's behavior and whether that behavior indicates that the tortious conduct was done within the officer's area of affirmative official responsibility and with the officer's consent or approval. Liability must be premised upon a corporate officer's meaningful participation in the wrongful acts." *Lawlor*, 758 A.2d at 977. "Sufficient [meaningful] participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.*

The Mohammeds maintain that they are entitled to summary judgment in their favor because there is no evidence that either of them personally committed, participated in, or inspired any of the alleged acts of negligence that the plaintiff claims caused injury to Mr. Suggs. But contrary to the Mohammeds' assertions, the plaintiff introduces evidence of the Mohammeds' actions and omissions which demonstrate that they did participate in and have knowledge of Symbral's negligent acts toward Mr. Suggs. Ms. Mohammed signed the contracts with the District of Columbia on behalf of Symbral to provide for its residents' medical needs and habilitation care. Ms. Mohammed also developed and signed the plans of correction for

statements of deficiencies issued for Symbral's failure to comply with federal regulations.  And

Mr. Mohammed was involved in seeking consent from Mr. Suggs's sister for his laminectomy,

including calling Ms. Weaver and editing the letter that was sent to her in reference to Mr.

Suggs's medical condition.  All of these facts demonstrate the Mohammeds' knowledge of Mr.

Suggs's declining medical condition and their involvement in Symbral's failure to take

appropriate action to properly meet the standard of care that Symbral owed to Mr. Suggs.  The

Mohammeds have not offered any evidence to disprove or at least create a genuine issue of

material fact regarding this involvement in Symbral's tortious conduct.  Thus, for purposes of the

plaintiff's negligence claim against the Mohammeds, the Court finds that the plaintiff has

presented sufficient evidence to demonstrate that no genuine issue of material fact remains as to

whether the Mohammeds participated in and had knowledge of Symbral's negligence toward Mr.

Suggs.  Consequently, the Mohammeds' motion for summary judgment on Count I is denied and

the plaintiff's motion for summary judgment on Count I is granted.

### 2. *Count III: Breach of Fiduciary Duty; Count V: Medical Negligence*

In Count III, plaintiff brings a claim for breach of fiduciary duty against all of the

defendants, claiming that they breached their fiduciary responsibility to provide for Mr. Suggs's

care, safety, and medical and nursing needs and that Mr. Suggs was harmed as a result.  In Count

V, plaintiff brings a claim for medical negligence against Symbral, the Mohammeds, and Dr.

Egbuonu, claiming that they breached their duty to Mr. Suggs to exercise the degree of care,

skill, and diligence ordinarily exercised by health care providers, and that this breach of duty

caused Mr. Suggs harm.

Defendants have moved for summary judgment on these claims against them on the basis

that plaintiff's claims for breach of fiduciary duty and for medical negligence are entirely

duplicative of plaintiff's negligence claim in Count I, which alleges that the defendants breached their duty of care to Mr. Suggs by failing to provide adequate medical, nursing, and general care and adequate nutrition and hydration.  To state a claim for negligence, the plaintiff must allege facts that establish (1) a duty owned by the defendants to the plaintiff to exercise reasonable care, (2) a breach of this duty, and (3) an injury to the plaintiff proximately caused by the defendant's breach.  *Ponder v. Chase Home Finance*, 666 F. Supp.2d 45 (D.D.C. 2009).  To state a claim for breach of fiduciary duty, a plaintiff must allege (1) the existence of a fiduciary duty owing to the plaintiff from the defendant and (2) a breach of that duty.  *Command Consulting Group, LLC v. Neuraliq, Inc.*, 623 F. Supp. 2d 49, 54 (D.D.C. 2009).  To state a claim for medical negligence, the plaintiff must establish (1) the applicable standard of care, (2) a deviation from that standard, and (3) a causal relationship between that deviation and the plaintiff's injury.  *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984).  All three claims rest on the same factual allegations, would be decided under the same legal standards as one another, and authorize the same forms of relief.  *See Iacangelo v. Georgetown University*, 760 F. Supp. 2d 63, 65 (D.D.C. 2011).  "As a matter of judicial economy, courts should dismiss" such duplicative claims.  *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010).  In particular, courts applying District of Columbia law should dismiss claims for breach of fiduciary duty that merely restate malpractice claims.  *See Hinton v. Rudasill*, 384 Fed. Appx. 2, 2 (D.C. Cir. 2010); *Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662, 670 n.4 (D.C. 2009).

The Court therefore grants summary judgment on Count III for Symbral, the Mohammeds, and the District of Columbia and grants summary judgment on Count V for Symbral and the Mohammeds.

### 3.   *Count XI: Punitive Damages*

In Count XI, the plaintiff asserts a claim of punitive damages against Symbral, the Mohammeds, and Dr. Egbuonu.  Punitive damages may be recovered only when the defendant committed a tortious act "accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury."  *Washington Medical Center, Inc. v. Holle*, 573 A.2d 1269, 1284 (D.C. 1990).  "Whether punitive damages will lie depends on the intent with which the wrong was done, and not on the extent of the actual damages."  *Id.*  Punitive damages may be awarded only if it is proven, by clear and convincing evidence, that the defendant's tortious act was accompanied by conduct and a state of mind evincing actual malice or its equivalent.  *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995), *cert. denied*, 519 U.S. 1148 (1997).  A showing of negligence—even gross negligence—is insufficient to support an award of punitive damages.  *Knippen v. Ford Motor Co.*, 546 F.2d 993, 1003 (D.C. Cir. 1976).  Rather, punitive damages are reserved for only those tortious acts that are "replete with malice."  *Zanville v. Garza*, 561 A.2d 1000, 1002 (D.C. 1989).

The facts established by the record demonstrate that the plaintiff's claims are nothing more than mere negligence claims.  Plaintiff has not demonstrated that Symbral or the Mohammeds acted with evil motive, actual malice, deliberate violence, or intent to injure Mr. Suggs.  The plaintiff also has not presented any evidence from which a reasonable jury could find by clear and convincing evidence that Symbral or the Mohammeds' negligent conduct rose to the level of being so outrageous and reckless as to be "replete with malice."  And even though punitive damages are available for intentional infliction of emotional distress and breach of

fiduciary duty, these claims have been dismissed. The Court will therefore enter summary judgment for Symbral and the Mohammeds on Count XI.

### 4.   Count II: Negligent Hiring and Retention

In Count II, the plaintiff brings a claim of negligent hiring and retention against Symbral and the Mohammeds, alleging that these defendants were negligent in hiring and retaining employees and physicians that worked at Symbral and cared for Mr. Suggs. Symbral and the Mohammeds move for summary judgment on this claim on the basis that because Symbral does not dispute its responsibility for the allegedly negligent conduct of its employees, no independent cause of action lies for negligent hiring or retention.

In *Hackett v. WMATA*, 736 F. Supp. 8 (D.D.C. 1990), Judge Penn dismissed the plaintiff bus passenger's negligent hiring, supervision, and retention claim against the transit authority arising from a bus collision as "prejudicial and unnecessary." *Id.* at 11. Judge Penn reasoned that the transit authority had admitted that the driver was operating the bus within the scope of his employment with respect to the passenger's respondeat superior claim, and because there were no additional allegations that could serve as the basis for an award of punitive damages, the negligent hiring claim would not impose any additional liability upon the defendant and should therefore be dismissed. *Id.* at 10–11.

In the present case, Symbral has never asserted that any of its employees who cared for Mr. Suggs acted outside the scope of their employment or that Symbral is not vicariously liable for their acts. However, the plaintiff argues that he should be allowed to proceed on both the negligence claim and the negligent hiring and retention because he seeks punitive damages. Yet as demonstrated above, the plaintiff has not set forth any facts to support an award of punitive damages. It follows that the plaintiff's negligent hiring and retention claim against Symbral and

the Mohammeds, which would not impose any additional liability on the defendants, is prejudicial and unnecessary. *See Hackett*, 736 F. Supp. at 10–11. The Court therefore grants Symbral and the Mohammeds' motion for summary judgment on Count II.

### 5. *Count IV: Negligence Per Se*

In Count IV, plaintiff alleges that Symbral and the Mohammeds violated 42 C.F.R. § 483.1 et seq., D.C. Code § 44-501 et seq., and 22 D.C.M.R. Ch. 30–35, and that these violations constitute negligence per se. Symbral and the Mohammeds move for summary judgment on this count.

The theory of negligence per se is a "slight variation" on the general negligence standard, pursuant to which a plaintiff may, in some circumstances, rely on a statute or regulation to provide the applicable standard of care. *McNeil Pharmaceutical v. Hawkins*, 686 A.2d 567, 577–78 (D.C. 1996); *cert. denied*, 522 U.S. 815 (1997). For the statute or regulation to provide the applicable standard of care for the plaintiff's case, the statute or regulation "must promote public safety and have been 'enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred.'" *Id.* at 579 (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 557 (D.C. Cir. 1993)). Additionally, the statute or regulation "must not merely repeat the common law duty of reasonable care, but must set forth 'specific guidelines to govern behavior.'" *Id.* (quoting *Joy*, 999 F.2d at 558). "[A] common sense approach to the negligence per se doctrine suggests that specific obligations must be set forth on the face of a regulation for that doctrine to come into play." *Joy*, 999 F.2d at 558. Finally, to prevail on a negligence per se theory, the plaintiff—as in any negligence case—must prove that the alleged violation of the statute or regulation was a proximate cause of his injuries. *McNeil Pharmaceutical*, 686 A.2d at 578.

The plaintiff sets forth three separate bases for its negligence per se claim: one premised on a federal regulation, the second premised on a District of Columbia statute, and the third premised on a District of Columbia municipal regulation. The plaintiff does not allege specifically which subsections of the statute and regulations in question have been violated by Symbral and the Mohammeds. However, the Court will proceed by treating the plaintiff's case under the relevant subsections of each.[2]

### a.   42 C.F.R. § 483.1 et seq.

Plaintiff's amended complaint alleges negligence per se in violation of a standard of care set out in 42 C.F.R. § 483.1 et seq. The relevant portion of these regulations is found from 42 C.F.R. §§ 483.400 through 483.480, which establish "Conditions of Participation for Intermediate Care Facilities for the Mentally Retarded." The regulations set forth the requirements for an ICF/MR to participate in the Medicare program and establish conditions of participation in the following areas: management, client protections, facility staffing, active treatment services, client behavior and facility practices, health care services, physical environment, and dietetic services.

For these regulations to provide the basis of the plaintiff's negligence per se claim, they must have been designed to protect a class of people to which the plaintiff belongs or to prevent against the type of accident that occurred. *Youngbey v. District of Columbia*, 766 F. Supp. 2d 197, 221 (D.D.C. 2011) (citation omitted). The requirements set out in 42 C.F.R. §§ 483.400 through 483.480 were not promulgated to protect mentally retarded residents of intermediate

---

[2] In his opposition [141], the plaintiff conflates the concept of a negligence per se claim, which turns on whether a statute or regulation defines the applicable standard of care, and a private cause of action that is established or implied by a statute. Nowhere did the plaintiff's amended complaint suggest that he was pursuing a private cause of action under D.C. Code. § 44-1004.03, as he now asserts. What's more, even though D.C. Code. § 44-1004.03 creates a private cause of action based on a violation of "any standard or resident's right established pursuant to § 44-504(a)(3)," the plaintiff does not even specify what standard or right has been violated as the basis for this private cause of action.

care facilities, such as the plaintiff, but rather were designed to ensure that ICF/MRs perform certain basic duties in order to participate in the Medicare program.  While the Court recognizes that the standards set out in 42 C.F.R. §§ 483.400 through 483.480 do indirectly protect residents of ICF/MRs like the plaintiff, this was not the primary purpose of enacting the regulations. Rather, the regulations constitute a mechanism to impose conditions on the receipt and use of Medicare funding by ICF/MRs.  Moreover, the standards set out in these regulations do not impose any specific obligations on ICF/MRs that are any different than or more particular than the common law duty of reasonable care that ICF/MRs owe to their residents.  Therefore, as a matter of law the plaintiff does not have a negligence per se claim under 42 C.F.R. § 483.1 et seq, and the Court will grant summary judgment to Symbral and the Mohammeds on this first theory of negligence per se.

### b.  D.C. Code § 44-501 et seq.

Plaintiff's amended complaint also alleges negligence per se in violation of a standard of care set out in D.C. Code § 44-501 et seq.  This subchapter only concerns licensure of various types of health care and community residence facilities, including group homes for persons with mental retardation.  However, the subchapter merely establishes licensing requirements for these facilities and does not define or describe any specific obligations or substantive standards of care owed by these facilities to their residents.  Therefore, as a matter of law the plaintiff does not have a negligence per se claim under D.C. Code § 44-501 et seq, and the Court finds that summary judgment should be granted for Symbral and the Mohammeds on this second theory of negligence per se.

### c.   22 D.C.M.R. Ch. 30–35

Additionally, plaintiff's amended complaint alleges negligence per se in violation of a standard of care set out in 22 D.C.M.R. Ch. 30–35.   The only relevant chapter in these regulations is Chapter 35, which concerns group homes for mentally retarded persons.   This chapter does not merely reiterate the common law standard of care owed to mentally retarded residents of group homes in the District of Columbia.   Rather, the regulations set forth in detail "specific guidelines to govern behavior" that ICF/MRs such as Symbral must abide by when caring for residents like Mr. Suggs.   *Joy*, 999 F.2d at 558.   The guidelines detailed in the regulations were clearly enacted to protect the health, welfare, and safety of residents such as Mr. Suggs who reside in group homes for mentally retarded persons in the District of Columbia. However, the plaintiff has not set forth any facts alleging a specific violation of any of the standards of care created in Chapter 35, nor has the plaintiff linked a violation of these standards of care to the harm suffered by Mr. Suggs.   Accordingly, the Court finds that summary judgment for Symbral and the Mohammeds is appropriate under this third theory of negligence per se.

### 6.   *Count X: Intentional Infliction of Emotional Distress*

In Count X, the plaintiff brings a claim of intentional infliction of emotional distress against all defendants, contending that they intentionally and recklessly caused Mr. Suggs emotional distress by subjecting him to severe neglect and substandard nursing and medical care, that their conduct was intentionally taken with reckless indifference to the extreme emotional distress that it would cause, and that their conduct was outrageous, intolerable, and beyond all possible bounds of human decency in a civilized community.   Am. Compl. ¶¶ 89–90.   The plaintiff alleges that Mr. Suggs sustained physical injury and emotional distress as a direct and

proximate result of the defendants' outrageous conduct.  Symbral, the Mohammeds, and the District of Columbia move for summary judgment on this claim.

To prevail on a claim for intentional infliction of emotional distress, the plaintiff must show that (1) the defendants engaged in extreme and outrageous conduct, (2) the defendants acted intentionally or recklessly, and (3) this conduct caused the plaintiff severe emotional distress.  *See Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991).  To establish the required degree of "outrageousness," the plaintiff must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citing Restatement (Second) of Torts § 46 cmt. d (1965)).  In general, "a case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998).

The defendants argue that they are entitled to summary judgment because their conduct forming the basis of the plaintiff's claim could not possibly be characterized as "so outrageous in character . . . to be regarded as atrocious, and utterly intolerable in a civilized community." *Bernstein*, 649 A.2d at 1075.  However, the Court need not reach this question because the plaintiff has placed absolutely no facts in the record to support the plaintiff's claim that the defendants' conduct—outrageous or not—caused Mr. Suggs severe emotional distress.  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[, and t]he moving party is entitled to judgment as a matter of law." *Celotext Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court will therefore enter summary judgment in favor of Symbral, the Mohammeds, and the District on Count X.

### C.  Plaintiff's § 1983 Claims

In Counts VI and VII, the plaintiff brings claims for deprivation of civil rights under 42 U.S.C. § 1983 against Symbral, the Mohammeds, and the District.  Symbral, the Mohammeds, the District, and the plaintiff have moved for summary judgment on these counts.

To state a claim for a § 1983 violation, the plaintiff must allege: (1) a violation of Mr. Suggs's rights under the Constitution or federal law by a person acting "under color of state law," *West v. Atkins*, 487 U.S. 42, 48 (1988), and (2) that the violation was a result of a municipal policy or custom, *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978).  The plaintiff must allege an "'affirmative link,' such that a municipal policy or custom was the 'moving force' behind the constitutional violation."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citations omitted).  The plaintiff may demonstrate such a municipal policy or custom based on the failure of the municipality to respond to a need in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations.  *City of Canton, Ohio v. Harris*, 489 U.S. 379, 390 (1989); *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000).   "Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard."  *Baker*, 326 F.3d at 1307 (citation omitted).

The plaintiff claims that the defendants violated Mr. Suggs's Fifth and Fourteenth Amendment rights to a safe and secure environment, to freedom from harm, and to habilitative care and treatment.  The plaintiff moves for summary judgment in his favor as against Symbral, the Mohammeds, and the District.

### 1.   *Symbral and the Mohammeds*

Symbral and the Mohammeds move for summary judgment on the grounds that (1) they are not state actors, and (2) even if their actions are found to have been negligent, their conduct does not meet the "deliberate indifference" standard.

To determine whether Symbral and the Mohammeds should be considered state actors for the purposes of liability under Section 1983, the Court will consider: (1) whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the state itself; (2) whether the state has exercised coercive power or provided significant encouragement to the private action; and (3) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state. *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295 (2001); *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). This determination is necessarily a "fact-bound inquiry." *Brentwood*, 531 U.S. at 298.

Neither a contractual relationship between a state and a private entity nor the entity's reliance on public funding is sufficient to transform the private entity into a state actor. "Acts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982). Nor does the fact that a private entity is subject to extensive state regulation make the entity a state actor. *Id.* Additionally, a private entity does not become a state actor merely because it performs a function that serves the public or because the government performs the same function. Rather, the relevant question "is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Id.* (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)).

In this case, Symbral is a privately owned, nonprofit organization run by the Mohammeds.  Under annual contracts with the District, Symbral provided room and board and intermediate nursing care to the residents of its ICF/MRs.  Symbral employed the personnel who worked at its group homes and contracted with various professionals to provide services to Symbral's residents.  Symbral received Medicaid payments from the District of Columbia for the care that it provided to these residents, the District licensed and inspected Symbral's homes and monitored the care that Symbral provided, and Symbral was subject to federal and state regulations.  However, neither the federal government nor the District of Columbia directed Symbral's operations and activities.  Moreover, as a number of courts have recognized, providing care and services to disabled individuals has not historically been the exclusive function of the government.  *See, e.g.*, *Karaahmetoglu v. Res-Care, Inc.*, 480 F. Supp. 2d 183 (D.D.C. 2007); *Sybalski v. Independent Group Home Living Program, Inc.*, 2007 WL 1202864, at *4–5 (E.D.N.Y. 2007); *Dow v. Terramara, Inc.*, 835 F. Supp. 1299, 1303 (D. Kan. 1993).

Based on the facts of this case, it is clear that Symbral and the Mohammeds are not state actors.  The Court therefore will not reach the question of whether these defendants' conduct meets the "deliberate indifference" standard, as it finds that summary judgment should be granted on Count VII in favor of Symbral and the Mohammeds.

### 2.   *District of Columbia*

The District of Columbia moves for summary judgment on the grounds that (1) the District had no constitutional duty to provide Mr. Suggs with adequate medical care, and (2) even if there was such a duty, the plaintiff cannot show that it is the District's policy or custom to subject those enrolled within its developmental disability programs to constitutional violations.

### a. Constitutional Rights of Mr. Suggs

For purposes of Section 1983 actions, the District of Columbia is a state. *See* 28 U.S.C. § 1343(b). Therefore, every MRDDA employee responsible for Mr. Suggs's safety and well-being acted under color of state law. The District argues that it did not owe Mr. Suggs an affirmative duty under the Constitution to provide him with adequate medical care because he was voluntarily committed to the District's care, and thus no constitutional rights were triggered. This is not the case. In fact, the District's argument that Mr. Suggs was voluntarily committed is premised upon a misconception of its own statutory scheme governing the commitment of mentally retarded individuals.

Upon his sister filing a petition with the United States District Court of the District of Columbia pursuant to D.C. Code § 21-1108 (1967 Ed.), Mr. Suggs was adjudged to be feebleminded and committed to the custody of the District of Columbia to reside at the District's Forest Haven facility. *See* Pl.'s Mot. for Summ. J., Exs. 1, 3. The statute defined a feebleminded person as "one who requires supervision, control and care for his own welfare, or for the welfare of others, or for the welfare of the community." *Id.* Ex. 3. Once committed, Mr. Suggs was not free to leave without a court order discharging him. *Id.* Ex. 3. In 1978, the D.C. Council enacted Law 2-137, the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978.[3] In its report on Law 2-137, the D.C. City Council acknowledged that "the only way a mentally retarded person can be admitted to Forest Haven is to have his family relinquish his guardianship to the District." *Id.* Ex. 28, at 8. The District's revised statutory scheme governing the commitment of mentally retarded individuals says that "[a] written petition by a parent or guardian may be filed with the Court to have an individual . . . who is believed to have

---

[3] The law was originally codified as D.C. Code § 6-1901, et seq. *See* Pl.'s Mot. for Summ. J., Ex. 55. Law 2-137 is now codified as D.C. Code § 7-1301.01, et seq.

mental retardation, committed to a facility," but the Court must determine whether the individual is "competent to refuse such commitment."  D.C. Code § 6-1924 (1978).  The District argues that because the statute says that a written petition to commit the individual "may" be filed, such commitments are voluntary.  However, under the statute, "'commitment' means the placement in a facility, pursuant to a court order, of an individual who is at least moderately mentally retarded at the request of the individual's parent or guardian without the consent of the individual."  D.C. Code § 6-1902(4) (1978).  Following the close of Forest Haven, Mr. Suggs's commitment to MRDDA continued under § 6-1924.  *See* Def. District of Columbia's Mot. for Summ. J. [123], Ex. A ¶ 1.  The statutory definition plainly demonstrates that Mr. Suggs's commitment under this section was in fact involuntary.  The District also asserts that Mr. Suggs's commitment was voluntary because the statute reserved to his sister, who originally petitioned for his commitment, the right to request discharge from commitment.  *See* D.C. Code § 6-1928 (1978).  The District offers no support for this meritless argument.  The existence of the right to request discharge does not preclude Mr. Suggs's commitment from being involuntary in nature, as the express language of the statute makes clear.

Moreover, as the District itself concedes in its Statement of Undisputed Material Facts, Mr. Suggs was a member of the class of plaintiffs in *Evans v. Gray*, No. 76-cv-293 (D.D.C.) (Huvelle, J.) and is bound by the terms of the *Evans* settlement agreement.  *See* Def. District of Columbia's Mot. for Summ. J. [123], at 31; *id.* Ex. J.  The plaintiff class in Evans was defined as "those individuals who are now, have been, or will be residing at Forest Haven as a result of involuntary commitment."  Pl.'s Mot. for Summ. J. [128], Ex. 30.  In *Evans v. Washington*, 459 F. Supp. 483, 484 (D.D.C. 1978) ("Pratt decree"), Judge Pratt held that "the mentally retarded residents of Forest Haven who constitute the plaintiff class . . . have a federal constitutional right

to habilitative care and treatment based upon the Due Process Clause of the Fifth Amendment." The Pratt decree also established each class member's "federal constitutional right to be free from harm based upon the Fifth and Eight Amendments," as well as each class member's "federal constitutional right, based upon the Due Process Clause of the Fifth Amendment, to receive habilitative care and treatment in the alternative least restrictive of individual liberty and to be kept free from harm." *Id.* Thus, as a result of being involuntarily committed to the District's care and a member of the *Evans* class, Mr. Suggs had a Fifth Amendment right to habilitative care and treatment and a Fifth Amendment right to freedom from harm.

### b. Custom or Practice of the District of Columbia

The District also maintains that it is entitled to summary judgment because the plaintiff cannot show that it is the District's policy or custom to subject those enrolled within its developmental disability programs to constitutional violations. In order to form the basis for a municipal policy, a city's alleged custom or practice must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970). To establish municipal liability under Section 1983, the plaintiff in a "custom or practice" case must show "a persistent, pervasive practice of the city officials . . . which, although not officially adopted, was so common and settled as to be considered a custom or policy." *Carter v. District of Columbia*, 795 F.2d 116, 125 (D.C. Cir. 1986) (internal quotations omitted). The plaintiff must provide "concentrated, fully packed, precisely delineated scenarios," *id.*, which "cumulatively show a pattern amounting to a custom." *Id.* at 124.

Contrary to the District's assertions, the plaintiff has established facts sufficient to establish that the District has a longstanding custom or practice of deliberate disregard for the medical needs of *Evans* class members—including Mr. Suggs—and failing to protect them from

harm, in violation of their constitutional rights. Throughout the period of time at issue in this case, the District had a widespread policy of deliberate disregard for the protection of *Evans* class members and for ensuring their needs and adequate medical care. The District's stipulations of fact in *Evans*, made in December 2000, admit this widespread policy and demonstrate that the District did not just violate Mr. Suggs's constitutional rights, but also failed to respond to *Evans* class members' health and safety needs for a period of twenty years in a manner that amounts to deliberate indifference toward their constitutional rights. The widespread failures admitted to by the District include: mistakes in the District's system of support for individuals with developmental disabilities covering twenty years of neglect and mismanagement; the breakdown in services to clients with developmental disabilities in the District's system for nineteen years; the District government's fundamental failure of its obligation to disabled persons and their families; some of the systemic problems in the District's MRDDA system could lead to threats to the life and safety of individuals with developmental disabilities; the District was aware of problems of poor care provided at group homes, systemic failures, and other issues as a result of a Washington Post article published in February 1999; the MRDDA has had trouble getting provider contracts processed in a timely manner; the District's entire mental retardation and developmental disabilities system was fundamentally unable to deliver even the most basic services and is incapable of providing quality service; the District government lacks the capacity to adequately deliver the services that the individuals with developmental disabilities in the District's system require; MRDDA is not adequately meeting the needs of people with mental retardation; MRDDA employees and managers have not been provided appropriate or adequate training and there is no formal training program in place; MRDDA employees have not had adequate supervision; and case managers do not visit all

customers on their caseloads at least once per quarter as per MRDDA policy. *Evans v. Williams*, 139 F. Supp. 2d 79, 96–104 (D.D.C. 2001).

The District's involvement in the *Evans* litigation unequivocally establishes the fact that the District had actual or constructive knowledge of the risk of constitutional violations to the *Evans* class members unless adequate medical care was provided. Yet, the District allowed mistreatment of Mr. Suggs and other *Evans* class members to occur anyway. The notice established by the District's prior involvement in *Evans* and consent decree against the District, along with the plaintiff's own pleadings, establish a custom or policy of inaction that rises to the level of deliberate indifference.[4] *See Daskalea*, 227 F.3d at 441–42; *Baker*, 326 F.3d at 1306–07.

No reasonable jury could find on the basis of these facts that the District did not have a policy of deliberate indifference with respect to protection from harm and provision of medical care to *Evans* class members, including Mr. Suggs. The Court will therefore enter summary judgment on Count VI in favor of the plaintiff and against the District.

---

[4] The Court notes that it does not use the District's factual stipulations in *Evans* as a binding legal conclusion with offensive collateral estoppel effect against the District, but rather cites the District's *Evans* stipulations simply as the evidentiary basis for the plaintiff's conclusion that the District had a policy of deliberate indifference to the constitutional rights of *Evans* class members, including Mr. Suggs. Offensive collateral estoppel precludes a defendant "from relitigating identical issues that the defendant litigated and lost against another plaintiff." *Jack Faucett Associates, Inc. v. AT&T Co.*, 744 F.2d 118, 124 (D.C. Cir. 1984), *cert. denied*, 469 U.S. 1196 (1985). Three conditions must be satisfied before a party can be estopped from relitigating an identical issue previously decided: (1) the issue must have been actually litigated, that is contested by the parties and submitted for determination by the court, (2) the issue must have been "actually and necessarily determined by a court of competent jurisdiction" in the first trial, and (3) preclusion in the second trial must not work an unfairness. *Id.* at 125. In *Evans*, the District stipulated to the facts referenced here regarding its treatment of mentally retarded and developmentally disabled individuals. "Generally speaking, when a particular fact is established not by judicial resolution but by stipulation of the parties, that fact has not been 'actually litigated' and thus is not a proper candidate for issue preclusion." *Otherson v. Department of Justice, INS*, 711 F.2d 267, 274 (D.C. Cir. 1983). The District's *Evans* stipulations therefore hold no greater evidentiary weight than the other evidence presented by the plaintiff—they merely present the plaintiff with sufficient support for his § 1983 claim against the District because the District previously admitted to this demonstrated policy of deliberate indifference.

### D.  Plaintiff's Statutory Claims Under D.C. Law

Counts VIII and IX allege that Symbral, the Mohammeds, and the District violated statutory rights afforded Mr, Suggs under the Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978, currently codified at D.C. Code § 7-1301.02 et seq.  This Act makes it unlawful to deprive mentally retarded citizens of the District of their legal rights.  Specifically, the plaintiff seeks damages pursuant to D.C. Code § 7-1305.13 (Count IX) and D.C. Code § 7-1305.14 (Count VIII) for allegedly violating Mr. Suggs's rights under the Act.  Defendants move for summary judgment on the basis that neither section of the Act creates a private right of action for damages.

#### 1.  *D.C. Code § 7-1305.13*

Section 7-1305.13(a) states that "[a]ny interested party shall have the right to initiate an action in the Court to compel the rights afforded persons with mental retardation under this chapter."  Section 7-1305.13(b) then allows "the right to a civil remedy in an amount not less than $25 per day from the Director or the District of Columbia . . . for each day in which the said customer at a facility is not provided a program adequate for the habilitation and normalization pursuant to the customer's individual habilitation plan."  Section 7-1305.13(e) makes available attorney's fees and court costs for actions brought under this section.

The plain language of § 7-1305.13 provides for a private cause of action to compel rights—that is, an action for injunctive relief—as well as makes available a civil remedy that operates prospectively—meaning that a customer has a remedy for each day he *is* rather than *was* in an inadequate program.  This provision does not describe damages or liability.  In other words, this subsection simply imposes a monetary sanction—a per diem fine—on the District or a District official, after a program is determined to be inadequate, until the defective program is

remedied.  This remedy would therefore only be available to Mr. Suggs if he were still alive and residing in a facility that did not adequately meet his habilitation and normalization needs. Moreover, § 7-1305.13 does not provide for a claim for damages against a private entity like Symbral.  The Court therefore enters summary judgment in favor of Symbral, the Mohammeds, and the District on Count IX.

### 2.  D.C. Code § 7-1305.14

Under § 7-1305.14(c), "any person who violates or abuses any rights or privileges protected by this chapter shall be liable for damages as determined by law, for court costs and for reasonable attorneys' fees."  The defendants cite *Karaahmetoglu v. Res-Care, Inc.*, 480 F. Supp. 2d 183, 187 (D.D.C. 2007) (Leon, J.), for the proposition that "[a]lthough the statute may create a statutory duty, the fact that it allows for damages 'as determined by law' suggests that the statute creates only a common law remedy."  As a result, defendants argue, § 7-1305.14 does not support an independent cause of action for violations of the statute, and plaintiff's claim under this section must be dismissed.

However, Judge Leon's decision in *Karaahmetoglu* is not binding on this Court, and this Court declines to follow the decision's misguided reasoning.  The plain language of the statute explicitly provides that a plaintiff can be awarded attorneys' fees and court costs and still be awarded damages as determined under the traditional common law remedy.  The phrase "as determined by law" merely specifies how the monetary damages available under the statute are to be calculated; the availability of a common law remedy does not preclude the availability of a statutory cause of action.  If the statutory language were to provide that any person who violates or abuses any rights or privileges protected by this chapter *shall be liable as determined by law for damages*, this Court might be disposed to follow Judge Leon's interpretation of § 7-1305.14.

However, as the statute is plainly worded there is no support for Judge Leon's conclusion that the award of damages "as determined by law" indicates that the Code does not provide for an independent cause of action for violations of the Mentally Retarded Citizens Constitutional Rights and Dignity Act.  The Court therefore denies defendants' motion for summary judgment on Count VIII.

### E.  Effect of D.C. Code § 12-309 on Plaintiff's Recovery against the District

The District of Columbia puts forth the affirmative defense that the plaintiff's claims against the District for Mr. Suggs's injuries occurring before December 23, 1999 are barred by the plaintiff's failure to comply with D.C. Code § 12-309.  Under that provision, "[a]n action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage."  D.C. Code § 12-309.  Section 12-309 does not function as a statute of limitations; rather, it "imposes a notice requirement on everyone with a tort claim against the District of Columbia, and compliance with its terms is 'mandatory as a prerequisite to filing suit against the District.'"  *District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995) (citations omitted).  For purposes of calculating the timeliness of a § 12-309 letter, "the six month clock begins to run from the moment the plaintiff sustains the injury."  *Id.*

Section 12-309's notice requirement applies to District of Columbia statutory causes of action as well as to common law claims.  *See Giardino v. District of Columbia*, 505 F. Supp. 2d 117, 120–21 (D.D.C. 2007).  It does not, however, apply to plaintiff's claim against the District under § 1983.  *Daskalea v. District of Columbia*, 227 F.3d 433, 446 (D.C. Cir. 2000) (citing

*Brown v. United States*, 742 F.2d 1498, 1509 (D.C. Cir. 1984)).

Here, the plaintiff's attorney delivered notice letters to the Mayor's office on June 16, 2000 and June 23, 2000.  These letters alleged that District employees negligently monitored Mr. Suggs's medical condition by "allowing [him] to develop gangrene in his right leg, which in turn, required amputation . . . on January 5, 2000," and that "negligent monitoring of Mr. Suggs' condition by employees of the District of Columbia have [sic] caused ongoing pain, dehydration, depsis and decubitus ulcers."  *See* Def. District of Columbia's Mot. for Summ. J. [123], Ex. H. These notice letters alleged that the date of injury extended back to December 23, 1999.  The plaintiff's attorney mailed an additional letter to the Mayor's office on November 22, 2000, putting the District on notice that

> In addition to the injuries noted in the June 23, 2000 notice, i.e. pain, sepsis, dehydration, decubitus ulcers, gangrene and amputation of his right leg, Mr. Suggs died on June 30, 2000 at Providence Hospital.  His death was due to mistreatment, neglect, abuse, substandard living conditions, failure to properly monitor the group home, failure to provide proper medical care, and violation of Mr. Suggs' right to an adequate habilitation plan . . . .

Pl.'s Mot. for Summ. J., Ex. 62.

The District argues that the plaintiff has only satisfied the notice requirement of § 12-309 for any claims related to Mr. Suggs's injuries between December 23, 1999 and June 23, 2000. Mr. Suggs passed away on June 30, 2000—one week after the delivery of plaintiff's second § 12-309 notice letter on June 23, 2000.  The District maintains that the plaintiff's third notice letter to the Mayor's office was addressed to the incorrect address and therefore cannot be construed as providing notice to the Mayor—meaning that § 12-309 bars any claims that the plaintiff may have related to Mr. Suggs's death.  However, a comparison of the three notice letters mailed by the plaintiff's attorney shows that each one was addressed to the Mayor at 441 4th St., N.W., Washington, D.C. 20001.  In addition to this main address, the June 16 letter lists

"Room 1170 N" on the address, the June 23 letter lists "6th Floor - South" on the address, and the November 22 letter lists "One Judiciary Center" and "6th Floor - South" on the address. The Court finds these address differences to be immaterial. The substantial similarity in each of these addresses gives the Court no reason to construe the first two letters—but not the third—to be sufficient notice of the plaintiff's claims.

These notice letters make clear that although the plaintiff seeks damages from the District for Mr. Suggs's injuries from 1984 until 2000, the plaintiff has not satisfied the notice requirement of § 12-309 for injuries that occurred before December 23, 1999. The plaintiff's attorney tries to make up for his failure to provide the required notice to the District for injuries that occurred before December 23, 1999 by arguing that § 12-309 is not a jurisdictional bar. He maintains that the District has litigated this case since 2002 without ever raising § 12-309 as a defense, and so the Court should ignore his failure to comply with § 12-309 and deem the District's defense to be waived. However, the plaintiff's failure to comply with § 12-309 was included as a defense in the District's answer to plaintiff's amended complaint in 2003, which gave the plaintiff fair notice well in advance of the summary judgment stage that the District would be raising this defense to the plaintiff's claims. *See* District of Columbia Answer [16], at 6; *cf. Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 166 (D.D.C. 2005) (deeming the District's affirmative defense under § 12-309 to be waived at the summary judgment stage when it failed to plead the defense in either of its two previous motions to dismiss or in its answer to the plaintiff's second amended complaint).

The plaintiff also attempts to excuse this deficient notice by arguing that § 12-309 does not even apply to Mr. Suggs because Mr. Suggs's severe mental retardation prevented him of being aware of his injury, thereby precluding him from being able to provide sufficient notice

under the statute.  This argument is without merit.  District of Columbia case law makes clear that "tolling principles applicable to statutes of limitations do not apply in § 12-309 cases," including tolling because the plaintiff "has been non compos mentis since the time of the incident." *Gross v. District of Columbia*, 734 A.2d 1077, 1081 (D.C. 1999).

Therefore, the plaintiff's recovery of monetary damages from the District under his common law negligence claim is limited by § 12-309 to the period from December 23, 1999 through Mr. Suggs's death on June 30, 2000.  Moreover, if the plaintiff wins at trial on his D.C. Code § 7-1305.14 claim, the plaintiff's recovery of monetary damages from the District under that cause of action will also be limited to this period of time.

## IV.    CONCLUSION

For the foregoing reasons, the Court will GRANT IN PART and DENY IN PART Symbral and the Mohammeds' Motion [120] for partial summary judgment; GRANT IN PART and DENY IN PART the District of Columbia's Motion [123] for summary judgment; and GRANT IN PART and DENY IN PART plaintiff's Motion [128] for partial summary judgment. Accordingly, the Court enters summary judgment on: Counts I and VI for the plaintiff; Counts II, IV, V, VII, and XI for Symbral and the Mohammeds; and Counts III, IX, and X for Symbral, the Mohammeds, and the District of Columbia.  A genuine issue of material fact remains on Count VIII.

This case will proceed to trial on the following issues:

1. Whether Symbral, the Mohammeds, and the District of Columbia violated Mr. Suggs's rights under D.C. Code § 7-1301.02 et seq. and § 7-1305.14 (Count VIII);

2. All claims brought against Dr. Egbuonu: negligence (Count I), breach of fiduciary duty (Count III), medical negligence (Count V), intentional infliction of emotional

distress (Count X), and punitive damages (Count XI); and the amount of compensatory damages, if any, to be awarded to plaintiff under these claims;

3. The amount of compensatory damages to be awarded to plaintiff for Symbral's negligence, the Mohammeds's negligence, and the District of Columbia's negligence (Count I);

4. The amount of compensatory damages to be awarded to plaintiff for the District of Columbia's violation of 42 U.S.C. § 1983 (Count VI); and

5. The amount of interest, costs, and attorney's fees, if any, to be awarded to plaintiff pursuant to Counts VI and VIII.

Furthermore, the plaintiff's recovery of monetary damages from the District under his common law negligence claim is limited by D.C. Code § 12-309 to the period from December 23, 1999 through Mr. Suggs's death on June 30, 2000.  Moreover, if the plaintiff wins at trial on his D.C. Code § 7-1305.14 claim, the plaintiff's recovery of monetary damages from the District under that cause of action will also be limited to the period from December 23, 1999 through Mr. Suggs's death on June 30, 2000.

A separate Order consistent with this Opinion shall issue this date.


Signed by Royce C. Lamberth, Chief Judge, on January 27, 2012.