**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAVID HARVEY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil No. 02-2476 (RCL) |
| | ) |
| MOHAMMED, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Before the Court is the defendant District of Columbia's Motion [252] for a New Trial on

Damages or, in the Alternative, for Remittitur.   Upon consideration of the Motion, plaintiff's

Opposition [260] thereto, the District's Reply [265], the entire record of this case, and the

applicable law, the Court will DENY the Motion.

## I.    BACKGROUND[1]

Plaintiff David Harvey, as personal representative of the Estate of Curtis Suggs, brought

this suit against Leon and Yvonne Mohammed, Symbral Foundation for Community Services,

Inc., Donald C. Egbuonu, M.D., and the District of Columbia under 42 U.S.C. § 1983, D.C.

Code § 7-1301.02, et seq., federal and District of Columbia statutes regulating community

residential facilities, and District of Columbia common law.

Mr. Suggs was born in 1932 with severe physical and mental disabilities, including

cerebral palsy, and was committed to the District's custody in 1967.  From October 1984 until

---

[1] The following background facts are taken from this Court's Memorandum Opinion of January 27, 2012, which in turn relied on the parties' motions for summary judgment and attached exhibits.  *See Harvey v. Mohammed*, 841 F. Supp. 2d 164 (D.D.C. 2012).  That Memorandum Opinion includes a more detailed summary.

his death in 2000, Mr. Suggs lived in a group home operated by Symbral under annual contracts with the District.  Yvonne and Leon Mohammed founded Symbral and, at the time of the relevant events, served as CEO and CFO, respectively.  Dr. Egbuonu rendered medical care to Mr. Suggs at the group home.  The District, specifically the Mental Retardation and Developmental Disabilities Administration (MRDDA), remained legally responsible for Mr. Suggs and was to oversee his individual habilitation plan (IHP) which was developed by an Inter-Disciplinary Team (IDT) of clinicians, the MRDDA case manager, and the Symbral "qualified mental retardation professional."

Beginning in 1995, Mr. Suggs's health started to deteriorate; he lost strength in his upper extremities and became incontinent.  In September 1995, a physical therapist with the United Cerebral Palsy (UCP) day program in which Suggs was enrolled recommended a neurology consult to evaluate the decline in his upper body strength.  This examination was not scheduled and on February 20, 1997, Symbral was cited with a Deficiency Notice for failing to promptly schedule it.  Pursuant to a March 7, 1997 Plan of Correction, Ms. Mohammed agreed that Symbral would "make all medical appointments within one month of the recommendation" and she scheduled a neurology appointment that day.  The examining neurologist believed that cervical stenosis (compression of the cervical spine) could be the cause of Mr. Suggs's decline and recommended an MRI.  The MRI was not performed until April 18, 1997; it revealed severe spinal stenosis at the C-2 level of Mr. Suggs' spine.  Although Symbral was instructed to schedule a follow-up appointment, this appointment did not occur until June 27, 1997.  The same neurologist then recommended a surgery consult.  This consultation too was delayed and did not occur until November 11, 1997, when the examining neurosurgeon recommended that Mr. Suggs undergo a laminectomy in the following "weeks" to relieve pressure on his spinal cord.  Mr.

Suggs's IDT waited four months, until March 19, 1998, and then decided to get a second opinion. The IDT then waited over a year to get the second opinion. The physician who saw Mr. Suggs also recommended a cervical laminectomy. Symbral waited until mid-1999 to seek consent for the surgery from Mr. Suggs's sister, Carrie Weaver, and she declined to consent in August 1999. However, the District could have signed the consent for surgery on Mr. Suggs's behalf. Mr. Suggs was again evaluated in December 1999 and another neurosurgeon concluded that, at that time, surgery was unlikely to have any meaningful impact on Mr. Suggs's motor function or neurological status. Mr. Suggs never received the surgery. On June 30, 2000, Mr. Suggs died from complications related to the cervical stenosis.

This Court granted partial summary judgment for plaintiff in January 2012. Mem. Op., ECF No. 165. The Court held for the plaintiff with regard to his § 1983 claim against the District and his negligence claims against the District, Symbral, and the Mohammeds. *Id.* at 7–17. The Court denied summary judgment with respect to plaintiff's claim under D.C. Code § 7-1305.14 (Count VIII), though it later held for plaintiff as a matter of law on this count. *Id.* at 35–36; Pretrial Order 13, ECF No. 196. With respect to the negligence and § 7-1305.14 claims, District of Columbia statute barred recovery for injuries occurring before December 23, 1999 such that recovery was limited from that date to June 30, 2000. *Id.* at 36–39 (citing D.C. Code § 12-309).[2] Defendants Symbral and the Mohammeds settled before trial. *See* Order, ECF No. 221. The case against Dr. Egbuonu was dismissed for failure to prosecute. Pretrial Order 17.

A trial on damages was held in April 2012 to determine the amount of compensatory damages owed to plaintiff for the District's negligence and violation of § 1983. The jury

---

[2] The Court granted summary judgment to the defendants on plaintiff's claims of breach of fiduciary duty (Count III), medical negligence (Count V), negligent hiring (Count II), negligence per se (Count IV), intentional infliction of emotional distress (Count X), punitive damages (Count XI), and with respect to the § 1983 claim against Symbral and the Mohammeds. Mem. Op. 17–28, ECF No. 165.

awarded $2.9 million in compensatory damages, of which $500,000 was for the period December 23, 1999 to June 30, 2000. The District subsequently sought 50% contribution from Symbral and the Court held that the District was entitled to a $250,000 contribution, thus entering judgment against the district in the amount of $2.65 million. The District now moves for a New Trial on Damages or, in the Alternative, for Remittitur.

## II.   DISTRICT OF COLUMBIA'S MOTION FOR NEW TRIAL

The District argues that it is entitled to a new trial on damages, alleging various grounds, including: that the jury verdict was "tainted by improper exclusion of highly relevant evidence"; that plaintiff was allowed to introduce hearsay testimony and reports containing expert opinions; that the jury instructions improperly notified the jury of a potential "set-off" claim by the District; and that plaintiff's closing argument was improper in several ways. Def.'s Mem. in Supp. of Def.'s Mot. for New Trial on Damages or, in the Alternative, for Remittitur, ECF No. 252 [hereinafter Def's. Mem.].

### A.     Legal Standard

Federal Rule of Civil Procedure 59(a) allows courts to "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). "[T]he general grounds for a new trial are that the verdict is against the weight of the evidence, that the damages are excessive, . . . that for other reasons the trial was not fair, . . . [or that there were] substantial errors in the admission or rejection of evidence or the giving or refusal of instructions. The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice." 11 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2805 (3d ed.). However, "a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." *Id.*

The Federal Rules further provide that, "*[u]nless justice requires otherwise*, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial . . . .  [T]he court must disregard all errors and defects that do not affect any party's *substantial rights*."  Fed. R. Civ. P. 61 (emphasis added).  "Thus it is only those errors that have caused substantial harm to the losing party that justify a new trial. Those errors that are not prejudicial do not call for relief under Rule 59."  Wright & Miller, *supra*.  Finally, whether to grant a new trial is "entrusted to the sound discretion of the trial court."  *Grogan v. Gen. Maint. Serv. Co.*, 763 F.2d 444, 447 (D.C. Cir. 1985) (citation omitted).

The District argues that, even if an error individually would not warrant a new trial, the collective weight of the errors may have a substantial and injurious effect on the jury's verdict. Def.'s Mem. 15 (citing *United States v. Sepulveda*, 15 F.3d 1161, 1196–96 (1st Cir. 1993)).

### B.  District's Challenge to Pre-Trial Orders

The District argues that the Court erred in precluding the District "from introducing evidence to show 'alternative causes of Mr. Suggs's deterioration" or [to support] 'the theory that neck surgery would have caused Mr. Suggs more harm' [than foregoing the surgery]." Def.'s Mem. 3, 16 (citing Supplemental Pretrial Order 8–9, ECF No. 220).  The Court's Pretrial Order precluded the District from offering the testimony of Dr. David L. Jackson, who would have testified that Mr. Suggs would likely have suffered more had he had a laminectomy, that the District's oversight of Symbral's care met the standard of care, that the decision of Mr. Suggs's sister not to allow the surgery was reasonable under the circumstances.  Supplemental Pretrial Order 7–8.  The Court noted that liability had already been determined and that that this testimony was irrelevant to the question of the amount of damages to which Mr. Suggs was entitled.  *Id.* at 8.  The Court also held that the District was precluded from commenting during opening statement or introducing any witness, testimony, or evidence about matters regarding:

decisions of the IDT regarding Mr. Suggs; efforts to contact Mr. Suggs's sister; efforts of the District to monitor Symbral; alternate causes of Mr. Suggs' deterioration; the theory that neck surgery would have caused Mr. Suggs more harm; and other matters. *Id.* at 8–9. Again, the Court concluded that liability had already been decided and that these issues were irrelevant to the sole remaining issue of damages.

The District argues that "a defendant always should be permitted to show that the plaintiff's damages were caused by something other than the defendant's actions, even where the defendant's liability is [already] established." Def.'s Mem. 16. The District asserts that "much, if not all, of the decline in Mr. Suggs's health was attributable to his" existing health conditions rather than the District's conduct, *id.* at 16–17, and that the Court's Order prevented it from introducing evidence to support that theory. Def.'s Mem. 17–21.[3]

Plaintiff responds that, in order to prove that Mr. Suggs's harm was caused by a pre-existing condition or that a laminectomy would not have been helpful, the District would have had to have designated an expert to provide testimony on medical causation and they failed to do so. Pl.'s Opp'n to Def.'s Mot. for New Trial 4, ECF No. 260 [hereinafter Pl.'s Opp'n]. Plaintiff also states that the District failed to present evidence in opposition to plaintiff's earlier motion for summary judgment to refute evidence that the District's conduct caused Mr. Suggs to experience a decline in health, motor function, and strength as well as dehydration, ulcers, incontinence, paralysis of the diaphragm, and death. *Id.* at 5–6. The plaintiff argues that the Court properly "disallowed late named 'experts' whose purported opinions had never been supplied to Plaintiff in accordance with" Federal Rule of Civil Procedure 26(a)(2)(C). *Id.* at 6.

---

[3] The District bases its argument in part on the exclusion of expert testimony by Dr. Elliott Gersh. Because the District has separately argued that it was error for the Court to preclude Dr. Gersh's testimony, the Court considers that argument below.

This Court granted summary judgment to plaintiff on his negligence claim because it held that the District breached a duty to Mr. Suggs and that no reasonable juror could find that its monitoring of Symbral's care for Mr. Suggs was anything but negligent. It also noted that Mr. Suggs's condition had caused him to suffer paralysis and die. The Court also granted summary judgment to plaintiff on his § 1983 claim, holding that the District had a policy of deliberate indifference with respect to protection from harm and provision of medical care to Mr. Suggs.

At the summary judgment stage, the District had an opportunity to present the evidence that they complain was later excluded at trial. Specifically, they could have shown that Mr. Suggs had not suffered damages as a result of their alleged negligence or deliberate indifference and that they thus should not have been held liable. Instead, the District merely opined, without support, that "[g]iven Mr. Suggs' increasing infirmity as he approached the end of his 68 years of life, it was reasonable to conclude that spinal surgery including the pain and the recuperation period involved was more torture than therapy . . . ." Def.'s Opp'n 25–26. The only evidence presented in support of this theory was (1) a comment by a physical therapist in January 1998 that "[t]he functional changes that are present are not remarkable to this examiner—age is playing a role[,]" *id.* at 19 (citing Symbral Ex. 4, ¶ 13, Symbral Ex. 9), and (2) a reference to deposition testimony by Dr. Joel L. Falik, in which he speculated that a laminectomy would not have benefited Mr. Suggs if performed in April 1997, but that it might have if it had been performed in 1995 or 1996, Dep. of Joel L. Falik 24, 27, Def.'s Opp'n to Pl.'s MSJ, Ex. 2. The Court based its decision at the summary judgment stage on the evidence actually presented and held that the District's conduct had caused Mr. Suggs's injuries. The District cannot now complain that it was not allowed to relitigate liability at trial.

### C.      Preclusion of Expert Testimony from Dr. Elliot Gersh, M.D.

In the parties' Joint Pretrial Statement, filed on March 13, 2012, the District included Dr. Elliot Gersh among its proposed witnesses, stating that he would testify "that he was Mr. Suggs's medical doctor," that he "participated in the IDT meeting and was thus involved in the management Mr. Suggs's medical care," and that "the IDT acted to maximize Mr. Suggs's quality and life and minimize pain and suffering for Mr. Suggs." Joint Pretrial Statement 18, ECF No. 186.

Plaintiff moved to exclude expert testimony from Dr. Gersh because the District had failed to comply with Federal Rule of Civil Procedure 26(a)(2)(C). Pl.'s Mot. in Limine, ECF No. 206. During the April 4, 2012 pretrial conference and again by written Order, this Court ordered that, given the District's failure to comply with Rule 26(a)(2)(C), Dr. Gersh would be precluded from presenting expert testimony and would be limited to testifying as to facts observed. *See* Supplemental Pretrial Order 9.

The District moved for reconsideration, ECF No. 223, and the Court heard oral argument on the motion. Trial Tr. 96–106, Apr. 10, 2012. The District for the first time argued that, when the disclosures were made as to Dr. Gersh in 2004, the Federal Rules did not require that the District provide the opposing party with the subject matter or a summary of the facts and opinions to which the witness was expected to testify. *Id.* at 97. The Court reaffirmed its prior holding based on the District's failure to comply with Rule 26(a)(2)(C).

Here, the District yet again argues that the Court erred in precluding Dr. Gersh from providing expert testimony, suggesting that it was error for the Court to rely on Federal Rule of Civil Procedure 26(a)(2)(C). Def.'s Mem. 22–23. Before 2010, the Rules allowed a party to name a treating physician as the party would name any other witness. *Id.* at 23 (citing Fed. R. Civ. P. 26 Advisory Comm. nn. (West 2010)). The District argues that it complied with the

requirements of Rule 26 as they existed then by stating in its Rule 26(a)(1) disclosure that the District "refers to and incorporates the list of people submitted by the plaintiff and other defendants, which it believes represents a comprehensive and exhaustive list of people likely to have discoverable information." *Id.* (citing ECF No. 25). Co-defendant Symbral's earlier Rule 26(a)(1) disclosure had listed Dr. Gersh as an individual "likely to have discoverable information that . . . Defendants may use to support their defenses." *Id.* (citing ECF No. 23). The District argues that this gave plaintiff fair notice and that plaintiff had the chance to probe Dr. Gersh's opinions when he was deposed on March 28, 2012. *Id.* at 24.

Plaintiff reiterates that the District failed to identify Gersh as a witness in response to discovery requests or in its Rule 26(a)(2) disclosures. Pl.'s Opp'n 9. Plaintiff points out that the 2010 amendments to the Federal Rules took effect on December 1, 2010 and governed "all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending." U.S. Sup. Ct., Order of April 28, 2010, ¶¶ 2. Discovery in this case closed on June 30, 2011 and plaintiff argues that the District has failed to show why it would not have been "just and practicable" to make the 26(a)(2)(C) disclosures as to Dr. Gersh between December 2010 and June 2011, particularly since the District made such a disclosure with respect to another expert. *See* ECF No. 108, Jan. 11, 2011 (amending 26(a) expert disclosures and adding David Jackson, M.D.). Moreover, as late as March 30, 2012, one week before trial, the government sought to add six late witnesses and still failed to designate Gersh as an expert. *See* ECF No. 210. Accordingly, plaintiff asserts that Federal Rule of Civil Procedure 37(c)(1) precluded the District from using Dr. Gersh as an expert witness unless the District's failure to designate him as such was "substantially justified or . . . harmless." This "automatic sanction" of exclusion of a witness, *see* Fed. R. Civ. P. 37 advisory committee's note to 1993 Amendments, Subdivision (c),

is "mandatory" unless the party putting forth the witness can comply with the Rule's requirement to show that its failure was substantially justified or harmless. *Elion v. Jackson*, 544 F. Supp. 2d 1, 6 (D.D.C. 2008); *Norden v. Samper*, 544 F. Supp. 2d 43, 49 (D.D.C. 2008).

The Court agrees with plaintiff that it was proper to preclude Dr. Gersh from testifying as an expert. As an initial matter, the Court has already denied a motion for reconsideration on this exact issue, there is no reason for the Court to consider this issue yet again. Moreover, the District failed to comply with Rule 26(a)(2)(C). Although this Rule was not in effect in its current form when the District initially made its disclosures, the Rule went into effect before the close of discovery and the District in fact complied with it with respect to another potential expert witness. Thus, the District's failure to comply with Rule 26(a) cannot be said to be "substantially justified" or "harmless."

### D.      Testimony of Joan Whitney to Hearsay Facts and Opinions

The District argues that the Court erred in allowing Joan Whitney, an employee of United Cerebral Palsy ("UCP") to "testify about opinions and facts which were hearsay." Def.'s Mem. 25. Ms. Whitney was allowed to testify that a physical therapist at UCP believed that Mr. Suggs's health had deteriorated and that this was atypical for a person with his condition. Ms. Whitney was also allowed to testify based on reports prepared by other UCP providers, including a speech pathologist, nutritionist, and occupational therapist. *Id.* The District argues that during Ms. Whitney's testimony, the plaintiff was allowed to admit these reports and that they included "expert opinions," thus depriving the District of the chance to cross-examine the witnesses about their opinions. *Id.*

Plaintiff responds that the District has presented no evidence that it objected to the allegedly improper testimony. In any case, plaintiff notes that the records from UCP were

business records admitted under Federal Rule of Evidence 803(6), which provides that records of a regularly conducted activity are not excluded by the hearsay rule, regardless of whether the declarant is available as a witness.  Pl.'s Opp'n 13 (citing Fed. R. Evid. 803(6)).  Even if the testimony was hearsay, plaintiff argues that any error in its admission was harmless because plaintiff's expert, Dr. Diane Edwards, provided testimony similar to that of Ms. Whitney (e.g. that Mr. Suggs had trouble swallowing food and lost tongue lateralization and jaw mobility).

Rule 803(6) excludes from the rule against hearsay, regardless of whether the declarant is available as a witness:

> A record of an act, event, *condition*, *opinion*, *or diagnosis*, if
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) . . . ; and
>
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6) (emphasis added).

Federal Rule of Evidence 103 provides:

> A party may claim error in a ruling to admit or exclude evidence only if the error *affects a substantial right* of the party and (1) if the ruling admits evidence, a party, on the record (A) timely objects or moves to strike; and (B) *states the specific ground*, unless it was apparent from the context . . . .

Fed. R. Evid. 103 (emphasis added).

Here, the District objected to Ms. Whitney testifying regarding the observations of UCP physical therapist Marianne Westerhuis.  Specifically, Whitney stated:

> Our physical therapist was Marianne Westerhuis and she was concerned about Curtis's well-being. . . .  She noticed that his motor skills were declining, that she

> did not think was typical of his type of cerebral palsy in relation to the aging
> process . . .   [S]he noticed . . . there was weakness in his trunk, so that he
> was having difficulty sitting unsupported, he was no longer able to use his arms, and
> she did not feel that this was typical . . . and was concerned that there could be
> something else going on with him.

Trial Tr. 38, Apr. 11, 2012.  The District objected, stating, "[S]he can't testify about what other witnesses are going to say." *Id.*

The Court need not determine whether this testimony was hearsay because, even if it was, its admission was harmless.  Prior to this statement, Ms. Whitney had been asked, "In the 1990s, did you notice any change in [Mr. Suggs's physical abilities]?"  She responded:

> Yes.  We all did . . . .  [W]e started to notice that he was declining in his motor
> skills, motor abilities, meaning his ability to move his arms. . . .  [H]e was no
> longer able to use his arms to feed himself . . .  [H]e used to use a urinal to go to
> the bathroom.  He was no longer able to do that.  He became incontinent.  His
> ability to chew food and swallow food safely declined.

*Id.*  The District did not object to this testimony.  Moreover, the neurology consult actually written by Marianne Westerhuis was admitted into evidence as a business record and it described the motor decline about which Ms. Whitney had testified.

Finally, as the plaintiff points out, Dr. Edwards gave similar testimony, stating that Mr. Suggs's "initial decline was noted by the [UCP] physical therapist . . . [who] noticed that he all of a sudden developed this weakness . . . [that] was out of proportion and very different from the mild differences and changes we see over time in patients with [cerebral palsy]."  Trial Tr. 46, Apr. 16, 2012.  In short, even if the above-quoted testimony were hearsay, it was essentially repeated in non-hearsay form and its admission was harmless.

The District also objected to the introduction of plaintiff's exhibit 28, which included pages from Mr. Suggs's IHP, arguing that this "and the other IHP" were hearsay within hearsay because the IHP was a summary of other providers' reports.  *Id.* at 49–50.  Additionally, the District objected to the admission of plaintiff's exhibit 13, carbon copies of notes to the home or

documentation of phone calls to the home, on the grounds that they contained opinions.  The Court overruled these objections because the records were business records.  *Id.* at 59–60.  The District made numerous other objections without explanation which were not preserved and thus will not be considered now.[4]

The District's argument that the introduced reports unfairly allowed the introduction of "expert opinions" is misplaced.  First, Rule 803(6) specifically exempts records containing "opinion" or "diagnosis" from the hearsay exception.

> "Whether the qualifications of an expert witness whose opinion is contained in the [business] record must be affirmatively established depends upon the circumstances of the particular case.  A critical factor is whether the expert opinion was incident to or part of factual reports of contemporaneous events or transactions or conversely whether the expert opinion was specifically prepared for the purpose of being included in a record setting forth the expert's opinion."

30C Fed. Prac. & Proc. Evid. § 7047 (2d ed.).  Here, the opinions were clearly incident to or part of factual reports of contemporaneous events.

Thus, the Court rejects the District's arguments that it was error to allow Ms. Whitney to testify as to the physical therapist's observations or to allow plaintiff to admit reports prepared by other UCP providers and containing "expert opinions."

### E.    Jury Instruction Regarding $595,000 Set-Off

The District of Columbia filed a separate claim in the D.C. Superior Court seeking a $595,000 "set-off" from Mr. Suggs's estate pursuant to D.C. Code § 7.1303.11(a).  That statute provides that a "person with an intellectual disability . . . who receives habilitation, care, or both

---

[4] For example, the District objected, without explanation, to the admission into evidence of plaintiff's exhibit 22, the physical and occupational therapy consult Marianne Westerhuis completed with the UCP occupational therapist, Trial Tr. 41, Apr. 11, 2012; to the questioning of Ms. Whitney regarding the contents of that exhibit; to the admission of plaintiff's exhibit 24, a letter from Ms. Whitney to a Symbral employee, *id.* at 45; to the admission into evidence of plaintiff's exhibit 43, an oral motor skills evaluation by UCP's speech pathologist, *id.* at 55–56; to questioning about Ms. Whitney's observations of Mr. Suggs' hygiene after 1995, *id.* at 58; and to testimony by Ms. Whitney about recommendations UCP staff had made regarding Mr. Suggs' wheelchair, *id.* at 63.

from the District pursuant to this chapter, shall pay to the District the costs of habilitation, care, or both received . . . if the person . . . is able to pay [those] costs . . . ." The District conceded that this set-off is an affirmative defense. Because the District failed to raise it in their Answer, the Court held that the parties were "precluded from presenting to the jury the issue of the District's claimed right to set off." Supplemental Pretrial Order 10. However, the District could nevertheless assert the offset in probate court and the Court held that the jurors could be told about the possibility that such an offset would apply. Thus, the Court gave the following instruction:

> You are instructed that any award of damages may be subject to a claim by the District of Columbia that it is entitled to be repaid $595,000.00 for the cost of care it provided to Curtis Suggs from 1994 – 2000.

Jury Instructions 7, ECF No. 243; see also Def.'s Mem. 27.

The District primarily objects that this instruction implied "that Plaintiff was entitled to an enhanced amount of money damages to 'make up for' any reimbursement Plaintiff might be required to make to the District." *Id.* The District asserts that the instruction "supported this suggestion by informing jurors that they might want to adjust the award upward by $595,000 to ensure that Plaintiff netted the amount the jury intended." *Id.* Secondarily, the District asserts that the jury instructions should not have mentioned the set-off because the District had been precluded from presenting evidence of it to the jury, *id.* (citing Supplemental Pretrial Order 10), and because a trial judge "'may not charge the jury upon a supposed or conjectural state of facts, of which no evidence has been offered.'" *Id.* (quoting *Quercia v. United States*, 289 U.S. 466, 470 (1933)).

Plaintiff responds that the District failed to object to the jury instruction, Pl.'s Opp'n 14 (citing ECF No. 186, at 48), and that the District has thus waived the objection, *id.* (citing *Parker v. Dist. of Columbia*, 850 F.2d 708, 715 (D.C. Cir. 1988)).

The District did in fact object to this instruction, noting that the District had been precluded from offering evidence of the offset, that it would "prompt the jurors to speculate that the District would prevail in [the set-off] proceeding," and that it was "not relevant."  Trial Tr. 90–91, Apr. 17, 2012; *see also* Trial Tr. 2, Apr. 18, 2012.

Nevertheless, the instruction was reasonable.  First, jury instructions on damages routinely mention that damages may be subject to taxation and therefore reduced.  For example, the standard jury instruction on damages notes that "[a]ny damages [the jury] might award for emotional distress and for all other types of harm [other than physical injury or physical sickness] may be taxable."  Standardized Civil Jury Instructions for the District of Columbia (Richard W. Stevens, ed. 2002).  These instructions are appropriate despite the fact that juries could in theory decide to sufficiently increase to compensate for the tax consequences to that award.

Plaintiff's citation to *Quercia v. United States* does not convince the Court otherwise. 289 U.S. 466 (1933).  In that criminal case, the judge charged the jurors, "And now I am going to tell you what I think of the defendant's testimony. You may have noticed . . . that he wiped his hands during his testimony. . . .  [T]hat is almost always an indication of lying. . . .  I think that every single word that man said, except when he agreed with the Government's testimony, was a lie."  *Id.* at 468.  It was in this context that the Court noted that a trial judge "may not charge the jury 'upon a supposed or conjectural state of facts, of which no evidence has been offered.'"  *Id.* at 470.  This is nothing like the case at hand.  Here, the parties conceded that, depending on the outcome of the District's claim, the damages award in this case "may" be subject to a setoff. This Court did not attempt put a gloss on facts in evidence or to introduce a "supposed or conjectural state of facts."

15

Moreover, as plaintiff points out, the Court instructed the jury to base its verdict only upon the "evidence in the case" and that damages were appropriate only for "past injury that is not speculative."  Pl.'s Opp'n 15–16 (citing Jury Instructions 2, 7, ECF No. 243). There is no indication of how the jury used the information they were given about the set-off or whether they relied upon it in settling on a final amount of damages.

In short, it was not error to include a notice of the set-off in the jury instructions.

## F.      Objections to Plaintiff's Closing Remarks

### 1.      Material Misstatements of Fact

The District argues that Plaintiff's counsel erroneously told the jury that Mr. Suggs's sister had called Symbral on numerous occasions and Symbral told her the "whole time" that Suggs was "doing just fine."  Def.'s Mem. 29.  The District argues that this was inaccurate because Mr. Suggs's sister knew, "at least by February 1999" of the proposed laminectomy. They assert that "deliberate factual misrepresentations cannot be cured and are reversible error." Def.'s Reply 18.  They also suggest that plaintiff's statement was irrelevant and that the District could not rebut it because it had been precluded from eliciting evidence concerning efforts to contact Mr. Suggs's sister.  Def.'s Mem. 29.  Finally, the District argues that the statement "inflam[ed] the passion of the jury."  Def.'s Reply 19.

Based on the transcript of plaintiff's closing remarks, counsel said, "You also heard from Ms. Weaver. . . .  Do you remember when she said she called and called and called in the latter part of the 1990s, and they said he was fine?"  Trial Tr. 14, Apr. 18, 2012.  This summation was not entirely accurate.  Ms. Weaver stated that she visited Mr. Suggs in the group home twice per month until 1991 when she moved from Washington, D.C. to South Carolina because of her poor health.  Trial Tr. 95–96, Apr. 11, 2012.  Thereafter, she visited Mr. Suggs "whenever [she]

could," or "about twice every two months" until 1996 or 1997. *Id.* at 96. She stated that when she last saw her brother in 1996 or 1997, he was no longer able to communicate and that when she had seen him "in 1995, he was deteriorating . . . And [she] asked the caretaker who was on staff that day . . . 'What happened to him and why is he so weak . . . ?' 'Oh, he's fine.'" *Id.* at 97. Thus, although Ms. Weaver was told that Mr. Suggs was "fine," she did not state that she "called and called and called" to get that response.

Nevertheless, the Court holds that this misstatement was ultimately harmless. First, the District did not object to the statement when it was made. Second, the District has presented no evidence to suggest that plaintiff deliberately misstated Ms. Weaver's testimony and the misstatement was relatively minor. Third, this was an isolated comment that was not repeated during closing arguments. Moreover, the jury had had a chance to hear Ms. Weaver's testimony for themselves and had been instructed to rely on this as evidence rather than relying on the attorneys' opening or closing summations. Finally, the misstatement was not material to the issue of damages. The jury was instructed to compensate Mr. Suggs for the damages caused by the District's conduct. Whether his sister called the group house multiple times before being told that he was fine would not have factored directly into this calculation and the Court holds that it did not serve to prejudice or inflame the jury.

### 2.    Golden Rule Violation

The District argues that the plaintiff "violated the golden rule" by asking the jury to put themselves in Mr. Suggs's shoes and imagine what it would feel like to have your body slowly deteriorate but lack the mental faculties to understand why. Def.'s Mem. 30. This "'encourage[d] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" *Id.* (quoting 33 Fed. Proc., L. Ed. § 77:262).

Plaintiff responds that, by not including a trial transcript with its motion, the District has failed to show that plaintiff made a golden rule argument. Pl.'s Opp'n 18. Even if plaintiff made such an argument, plaintiff asserts that it would not be reversible error if, as here, no prejudice arises from the argument. *Id.* (citing *Ins. Co. of N. A. v. Gypsum Co.*, 870 F.2d 148, 154 (4th Cir. 1989), *quoted with approval in Caudle v. Dist. of Columbia*, 804 F. Supp. 2d 32, 52 (D.D.C. 2011).

A golden rule argument asks jurors "to place themselves in the position of a party," *Ins. Co. of N. Am. v. U.S. Gypsum Co.*, 870 F.2d 148, 154 (4th Cir. 1989), and is "'universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence.'" *Caudle v. Dist. of Columbia*, 707 F.3d 354, 359 (D.C. Cir. 2013) (quoting *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 491 (1st Cir.2010) (quotation marks omitted)). "The real danger is that the sympathy and the feelings of the jury will be encouraged and aroused so that the jury will decide the case and award damages out of relation to actual fault and actual damage." *Har–Pen Truck Lines, Inc. v. Mills*, 378 F.2d 705, 714 (5th Cir. 1967) (cited and quoted by *Caudle*, 707 F.3d at 359). For example, counsel may not "ask jurors how much the loss of the use of their legs would mean to them," *Caudle*, 707 F.3d at 359 (citing *Leathers v. Gen. Motors Corp.*, 546 F.2d 1083, 1085–86 (4th Cir. 1976)), or instruct jurors to "do unto others as you would have them do unto you," *id.* (citing *Klotz v. Sears, Roebuck & Co.*, 267 F.2d 53, 54 (7th Cir. 1959)). All circuits to have considered the issue have held a golden rule argument improper with respect to damages. *Id.*

The party asserting a golden rule violation must have preserved the argument by timely objecting to the statement. *See Skaggs v. J. H. Rose Truck Line, Inc.*, 435 F.2d 695, 696 (5th Cir. 1970) (per curium) ("The record discloses no objection by appellants' counsel to the [golden

rule] argument. Having failed to preserve this issue for appellate review, appellants have no

standing to raise it.").  Absent an objection, reversal would only be appropriate where there was

"plain error."  *See Blevins v. Cessna Aircraft Co.*, 728 F.2d 1576, 1580–81 (10th Cir. 1984)

("Although the [golden rule] remarks of plaintiff's counsel were improper, defendant failed to

make a timely objection. We conclude that the remarks do not amount to plain error requiring

reversal in the absence of an objection, particularly because of the proper instructions given the

jury on the law it should apply in determining liability and damages."); *Fleming v. Harris*, 39

F.3d 905, 908 (8th Cir. 1994) ("If an arguably improper statement made during closing argument

is not objected to by opposing counsel, we will reverse only under exceptional circumstances.").

Although the District asserts that plaintiff's counsel asked the jury to put themselves in

his shoes and imagine what it would feel like to have their bodies slowly deteriorate, the Court

cannot find such a statement in the record.  The District has provided no further details or proof

regarding what plaintiff's counsel may have said.  Even if counsel did make such a statement, the

District does not appear to have objected to it and thus did not preserve this argument.  The

transcript of closing arguments discloses only a handful of objections by the District, none of

which relate to an alleged Golden Rule violation.  In short, the Court rejects the District's

argument that plaintiff violated the Golden Rule.

### 3.      Plea for Punitive Damages

The District argues that plaintiff's closing argument tainted the jury by "effectively

injecting the issue of punitive damages into their deliberations."  Def.'s Mem. 31.  Specifically,

the District avers that Plaintiff instructed the jury to apply principles of "responsibility" and

"accountability" in reaching its verdict and suggested the District's conduct was "egregious."  *Id.*

Plaintiff responds that the mere use of the words "responsibility" and "accountability" cannot equate to a request for punitive damages. Pl.'s Opp'n 19. Moreover, plaintiff argues that the Court instructed the jury not to base their verdict on the lawyers' closing arguments: "In arriving at your verdict, you are to consider only the evidence in the case. . . . Statements and arguments of the lawyers, such as their . . . closing arguments, are not evidence." *Id.* (quoting Jury Instructions 3).

As a preliminary matter, the District objected to this language because it "look[ed] like instructions on the law," and not because it amounted to a request for punitive damages. As such, the District may have waived this argument.

Even if the argument is preserved, Plaintiff's closing statement did not amount to a plea for punitive damages. Plaintiff's counsel elaborated on his use of the terms "responsibility" and accountability" by stating that the District was "responsible for [Mr. Suggs's] care," Trial Tr. 10, Apr. 18, 2012, that it was "legally responsible for the injuries and damages they caused," *id.* at 22, that the responsibility he spoke of was a "moral, legal or mental accountability" and that the District would "not accept responsibility for what they did to Mr. Suggs." *Id.* at 44. He also stated that the District "utterly failed in their responsibility" and said that the jury's job was to "make them accountable for what they did." *Id.* at 45. "When the government takes someone under their custody and they promise to take care of them and provide adequate medical care, they must be held accountable if they don't do it." *Id.* at 19. Plaintiff's counsel and the jury instructions also repeatedly spoke of "fairly" and "adequately" compensating Mr. Suggs for the injury he actually suffered. *See id.* at 22, 24, 62–63, 69. The plaintiff's references to responsibility and accountability are in line with the notion that, because the District had already been held legally liable or responsible for negligent supervision of Mr. Suggs's care, they were

to be responsible or accountable for any damages they actually caused.  This is not equivalent to a request for punitive damages.

### III.    Motion for Remittitur to $250,000

In the alternative to a new trial on damages, the District seeks remittitur of the jury's verdict to $250,000.  It argues there was "scant evidence that Suggs experienced significant, persistent pain from 1995 through December 23, 1999" and that plaintiff "offered no direct or circumstantial evidence regarding the severity or duration of any pain experienced by Mr. Suggs" and that plaintiff's experts "filled the record with rank speculation about Mr. Suggs's excruciating pain."  Def.'s Mem. 33.

Federal trial courts may review jury awards of damages for excessiveness and may order remittitur or a new trial where damages are found excessive.  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996).  Reduction of a compensatory damage award may not be made without offering plaintiff the option of a new trial.  *Hetzel v. Prince William Cnty.*, 523 U.S. 208, 211 (1998).  In this Circuit, remittitur is appropriate only when either "(1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate."  *Peyton v. DiMario*, 287 F.3d 1121, 1126–27 (D.C. Cir. 2002) (internal citations omitted).  Courts may not set aside a verdict merely because the judge would have awarded a different amount, 11 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2807 (3d ed.), and courts "must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries."  *Langevine v. Dist. of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1997) (citation omitted).

The District presents two 1984 Fifth Circuit decisions for the proposition that the jury verdict in this case was excessive.  In *Hansen v. Johns-Manville Products Corp.*, the plaintiff, over a period of 13 months, suffered "mental anguish" and "some pain despite [being on pain] medication" before succumbing to injuries related to negligent inspection of asbestos.  734 F.2d 1036, 1047 (5th Cir. 1984).  The Court determined that remittitur from $800,000 to $250,000 was appropriate.  In *Sosa v. M/V Lago Izabal*, the Fifth Circuit vacated a $10 million award for pain and suffering and remanded with a suggestion that $1 million might be more appropriate. In that case, plaintiff had suffered burns on 80% of his body, but the Court noted that "although [he would] suffer throughout his life from itching and sensitivity, as well as from mental anguish, he [would] not have to endure the sort of continuing excruciating pain that might support" a $10 million award.  736 F.2d 1028, 1035 (5th Cir. 1984). [5]

The Court cannot agree that the jury's award against the District was "beyond all reason, so as to shock the conscience," or "so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate."

The cases cited by the District do not convince the Court otherwise.  *Johns-Manville* is distinguishable from the case at hand in that the plaintiff there suffered from minor pain for just 13 months.  Here, plaintiff presented evidence that, over the course of roughly five years, Mr. Suggs's health deteriorated and he suffered incontinence, inability to chew and swallow food, aspiration pneumonia, six hospitalizations, constipation, inability to breathe, development of pressure sores, painful skin flap surgery, and atrophy of the spinal cord which led to paralysis of

---

[5] The District also cites *Blakely v. Continental Airlines, Inc.* as a case in which a court remitted a jury verdict to $250,000.  992 F. Supp. 731, 735 (D.N.J. 1998).  This case is not particularly instructive.  It concerned a sexual harassment claim for which the jury awarded $500,000 for emotional distress and pain and suffering.  However, the only relevant testimony came from the plaintiff herself and an expert who met her for only two hours and reviewed her medical records for 90 minutes.  *Id.*  The expert concluded that she suffered "mild" emotional distress and that some of it was due to events in her life that were unrelated to the harassment.  *Id.*

the diaphragm, respiratory failure, and death.  Pl.'s Opp'n 22.  The plaintiff introduced evidence of multiple occasions when Mr. Suggs appeared to be in discomfort or pain.  *Id.*[6]

As to the District's citation of *Sosa*, the recommended award of $1 million in that case would amount to over $2 million in current dollars.  Moreover, the Fifth Circuit cited *Sosa* in a 1998 case in which it upheld an award of $3 million to the estate of a woman who suffered a "four-year losing battle with undiagnosed, untreated and unexplained pain."  *Wheat v. United States*, 860 F.2d 1256, 1260 (5th Cir. 1988).  Her pain steadily increased and was accompanied by intense mental anguish.  *Id.*

This Court's recent decision to order remittitur is not to the contrary.  In *Carmen Jean-Baptiste v. Dist. of Columbia*, the plaintiff asserted claims of sexual harassment and retaliation against the District of Columbia and this Court ordered remittitur of a $3.5 million jury verdict to $350,000.  No. 11-1587, 2013 WL 1092896 (D.D.C. Mar. 18, 2013).  However, the facts and evidence of damages presented in this case differ substantially from those put forth in *Jean-Baptiste*.  In *Jean-Baptiste*, this Court noted that "Jean-Baptiste may only be compensated for injuries actually incurred," and that her "testimony regarding her injuries simply was not

---

[6] A number of witnesses testified for plaintiff.  *See, e.g.*, Test. of Joan Whitney, Trial Tr. 35–72, Apr. 11, 2012 (testifying as to progressive problems with Mr. Suggs's ability to feed himself, to chew, to his increasingly smelling of urine and/or feces, the appearance of decubitus ulcers, "altered skin integrity," and "open skin area," and that on a number of occasions he "moan[ed] in discomfort," "moan[ed] and cr[ied]," and was in "great discomfort"); Test. of Dr. Faheem A. Sandhu, Trial Tr. 103–63, Apr. 11, 2012 (noting that, because Mr. Suggs had not had a laminectomy, "he ended up becoming paralyzed and really suffered the consequences of having a spinal cord injury," that he "had multiple respiratory problems, difficulty breathing [and] was hospitalized a number of times for that and ultimately died because of respiratory issues," that he experienced pressure sores and infections, some of which required surgical treatment, that he had to be hospitalized because of constipation, that his spinal cord compression caused paralysis of his diaphragm, other complications, and that many of his hospitalizations could have been avoided if his surgery had been done in a timely manner); Test. of Mary Crossland, Trial Tr. 27, 34–35,  Apr. 12, 2012 (noting that Mr. Suggs had chronic pressure ulcers, that certain of these wounds are "very painful" and "uncomfortable"); Test. of Dr. Joseph V. Boykin, Jr., Trial Tr. 68–105, Apr. 12, 2012 (testifying that Mr. Suggs had a skin ulcer that lasted two years before he received surgical treatment and that this type of wound is "very painful," that the pain is "constant," and that the "skin flap" surgery Mr. Suggs eventually received to treat the wound is "very painful" because the patient has "had [his] bone chiseled away and [has] had the muscles cut and [has] had them pulled together in a very unnatural situation" and that, after Mr. Suggs's surgery he "'cr[ied] out'" and was "'[n]ot responding to other comfort measures,'" that he cried when turned, and "'moaned most of the night'").

sufficient to support a $3.5 million verdict." *Id.* at *15.  Specifically, the plaintiff in that case

testified that the sexual harassment and retaliation had "affected [her] deeply," that she suffered

from stress, anxiety, and depression, that she gained weight and had hair loss.  However, her

testimony as to these damages was brief, did not include details regarding her injuries, and did

not indicate that she had sought medical or psychological help as a result of her injuries, apart

from beginning acupuncture because her "energy level was down."  Finally, she presented no

corroborating testimony or evidence, other than one comment by another witness, as to her

mental or physical state or the impact the harassment and retaliation had on her.

In short, the Court does not find that remittitur is warranted.

## IV.    CONCLUSION

The Court will deny the District's Motion for a New Trial on Damages.  The District has

not shown that the verdict was against the weight of the evidence, that damages were excessive,

or that the trial was unfair.  The District has also failed to show that remittitur is warranted.

An Order consistent with this Memorandum Opinion issues this date.

Signed by Royce C. Lamberth, Chief Judge, on April 24, 2013.